**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**(Northern Division)**

| | |
|---|---|
| UWM HOLDINGS CORP., and UWM ACQUISITIONS 1 LLC, <br><br> Plaintiffs, <br><br> v. <br><br> TWO HARBORS INVESTMENT CORP., <br><br> Defendant. <br><br> Serve on: <br><br> CSC-Lawyers Incorporating Service Co. <br> 7 St. Paul Street – Suite 820 <br> Baltimore, MD 21202 | Case No. _____ <br><br> **COMPLAINT FOR:** <br><br> **(1) WILLFUL BREACH OF CONTRACT, AND** <br><br> **(2) FRAUD** |

## COMPLAINT

Plaintiffs UWM Holdings Corporation ("UWMC") and UWM Acquisitions 1 LLC ("UWM Merger Sub," and together with UWMC, "UWM") for their Complaint against Defendant Two Harbors Investment Corp. ("TWO") allege as follows:

## INTRODUCTION

1. In 2025, UWM saw an opportunity to grow its already-successful business by acquiring TWO. At the end of the year, the companies entered into a definitive merger agreement. But TWO's management then had a change of heart about selling to UWM. Driven by pride, greed, and self-interest, TWO sabotaged the process, causing UWM to lose the lucrative business opportunity it had identified, pursued, and contracted to receive. Through this action, UWM seeks to recover more than $500,000,000 in damages caused by TWO's willful breaches of contract and cover-up.

2. UWM is one of the largest and most successful mortgage lending institutions in the United States. Headquartered in Pontiac, Michigan, UWM is the nation's top wholesale mortgage lender, originating hundreds of billions of dollars in residential mortgage loans and serving thousands of independent mortgage broker partners across the country.

3. In contrast, by 2025, TWO was on the ropes. It had been engaged in a highly public litigation battle with its former external advisor, Pine River Capital Management Advisers LLC ("Pine River"), resulting in TWO paying a $375 million settlement. The business and financial community had lost confidence in TWO as an operating entity, even though it had a valuable "book" of mortgage servicing rights, or MSRs. UWM saw tremendous promise in acquiring TWO, where it could apply its best-in-class operations to the TWO "book," resulting in cost savings,

operational efficiencies, revenue generation, and substantial profit. It was a win-win, as both TWO's and UWM's stockholders would benefit from the synergistic combination.

4.    In December 2025, after months of arm's-length negotiations, extensive due diligence, and a competitive auction among multiple suitors, TWO's Board of Directors unanimously endorsed UWM as the winning bidder based on the recommendation of TWO's financial advisor, Houlihan Lokey Capital, Inc. ("Houlihan Lokey"), which concluded that UWM's offer was fair to TWO stockholders and superior to all available alternatives, including an all-cash offer from CrossCountry Mortgage, LLC ("CrossCountry"). On December 17, 2025, UWM and TWO signed a merger agreement (the "Merger Agreement") under which UWM would acquire TWO in a stock-for-stock transaction valued at $1.3 billion (the "UWM Merger").

5.    Following execution of the Merger Agreement, TWO's management—led by its CEO, William Greenberg, and its Chief Legal Officer, Rebecca Sandberg—determined that they personally would be better off with a different deal. In willful defiance of their contractual commitments to UWM, TWO's management embarked on a stealth mission of subversion, calculated inaction, and outright lies designed to kill the UWM Merger. The complete extent of their actions will be the subject of discovery, but UWM alleges, among other things, that:

- In an effort to dissuade UWM and its advisors from locating an important cache of stockholders who might vote in favor of the UWM transaction, Ms. Sandberg misrepresented the composition of TWO's stockholder base. On March 7, 2026, Ms. Sandberg overstated—quantitatively and qualitatively—the institutional investor portion of TWO's stockholder base. In reality, retail investors control a much larger share and voice than Ms. Sandberg claimed. These retail investors were unlikely to vote without direct, targeted outreach. Ms. Sandberg knew the retail base was larger than she

represented, but she wanted to dissuade UWM and its advisors from reaching this important group.  By redirecting UWM and proxy experts away from retail investors, she successfully reduced the chances of obtaining the necessary favorable votes to approve the UWM Merger.

- Likewise, TWO refused to obtain a list of Non-Objecting Beneficial Owners ("NOBO list"), which is a fundamental prerequisite to any commercially reasonable proxy solicitation.  A NOBO list in this case would have cost less than $10,000, yet TWO's management refused to pay for it.  It was not until days before the stockholder meeting to vote on approval of the UWM Merger that TWO finally relented and obtained the NOBO list.  But, by that time, targeted outreach was too little, too late.

- TWO's proxy solicitor, D.F. King & Co., Inc. ("D.F. King"), did not cooperate with UWM and withheld key solicitation data that UWM repeatedly requested.  Information that TWO promised to deliver was either not provided or provided only in fragmented, delayed fashion after multiple rounds of follow-up.

- Given D.F. King's failure to cooperate, UWM hired its own proxy solicitor, Okapi Partners LLC ("Okapi"), in an urgent effort to secure the necessary votes.  Within days, Okapi did what TWO had not done.  Almost immediately, Okapi located 9,000 stockholder phone numbers, and within days, 20,000 numbers—which TWO or D.F. King easily could have accessed.

- TWO's management refused to permit Okapi to assist in TWO's purported solicitation campaign—even though UWM offered to bear the full cost of Okapi's involvement. TWO offered a laundry list of baseless and unprecedented excuses for its position, going so far as to claim that Okapi's involvement would create a purported "conflict."  That

excuse, in particular, was absurd because there is no conflict in an uncontested proxy solicitation.

- During the period of "non-solicitation" of the Merger Agreement, the Chief Executives of TWO and CrossCountry Mortgage remained in contact.  TWO claims the executive contact was part of the normal course of operations, but, on information and belief, UWM alleges that TWO's CEO, William Greenberg, directly or indirectly encouraged CrossCountry to make a competing offer in direct violation of the Merger Agreement's non-solicitation provisions.  Greenberg's solicitation worked as intended.

- After doing nothing for three months, on the precipice of the stockholder vote on the UWM proposal, CrossCountry swooped in and presented a new offer to acquire TWO. Reflecting how far along in the process it was and its confidence that TWO's Board would accept the solicited offer, CrossCountry presented a ready-to-sign merger agreement.  The CrossCountry offer provided *all-cash* lucrative "golden parachute" payments to TWO's management that would be paid at closing—a proposal management preferred to the shares of UWMC Class A common stock they would receive in the UWM Merger.

- Suspicious of CrossCountry's uncanny timing, UWM confronted TWO about its improper solicitation of a competing bid.  TWO acknowledged contact with the chief executive of CrossCountry, but predictably claimed TWO had not directly or indirectly encouraged CrossCountry to make a competing proposal.  Based on conduct at the time and TWO's subsequent conduct described below, UWM is now informed and believes that TWO's assertion was false.

- As a result of TWO management's misconduct, UWM was forced to increase its offer to protect the benefit of its bargain and the hundreds of millions of dollars in cost savings and revenue synergies the acquisition of TWO would afford UWM.  In a March 24 increased offer, UWM guaranteed TWO's stockholders at least $10.95 per share. UWM's offer exceeded CrossCountry's in every material respect: higher guaranteed value, faster closing, no financing contingency, and preservation of full upside for TWO stockholders through equity in the combined company.  And, because UWM's proposed transaction involved a stock-for-stock exchange, the transaction would be tax-free to TWO's stockholders, an additional benefit, particularly to TWO's substantial retail investor base.

- In willful defiance of a separate "good faith negotiation" provision of the Merger Agreement, TWO did not negotiate in good faith to determine if UWM would improve the deal in light of CrossCountry's supposedly unsolicited proposal.

- Then, on March 27, 2026—with stockholder approval for the UWM Merger almost locked up and votes rolling in daily—TWO suddenly terminated the UWM Merger Agreement, announced it was accepting CrossCountry's inferior offer, and canceled the upcoming stockholder meeting where the votes were to be tallied and recorded.

6.      TWO's chicanery, backroom dealing, and prioritization of management self-interest over its contractual and other legal obligations inflicted significant financial harm on UWM in the form of: lost profits, lost synergies, lost opportunities for capital efficiencies it would have realized in the UWM Merger; the opportunity to acquire each share of TWO common stock for 2.3328 shares of UWM common stock; and financing costs, regulatory costs, and third-party advisor costs incurred in trying to protect the benefit of its bargain—hundreds of millions of dollars

in damages that would never have resulted if TWO had not willfully breached the Merger Agreement and committed fraud.  By this action, UWM seeks to recover those massive damages.

## PARTIES

7.      Plaintiff UWMC is a Delaware corporation with its principal place of business at 585 South Boulevard East, Pontiac, Michigan 48341.  UWMC's shares are traded on the New York Stock Exchange.  In 2025, UWMC generated more than $1.5 billion in revenue, and its market capitalization presently exceeds $4.7 billion.

8.      Plaintiff UWM Merger Sub is a Delaware limited liability company and wholly owned subsidiary of UWMC.  UWM Merger Sub was formed in connection with the transactions contemplated by the Merger Agreement.

9.      Defendant TWO is a Maryland real estate investment trust with its principal place of business at 1601 Utica Avenue South, Suite 900, St. Louis Park, Minnesota 55416.  TWO invests in mortgage servicing rights and residential mortgage-backed securities, and its common stock trades on the New York Stock Exchange.  TWO may be served through its resident agent in Maryland, CSC-Lawyers Incorporating Service Company, 7 St. Paul Street, Suite 820, Baltimore, Maryland 21202.

## JURISDICTION AND VENUE

10.      This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332(a)(1) because Plaintiffs and Defendant are citizens of different states and the amount in controversy exceeds $75,000.00.

11.      This Court has personal jurisdiction over Defendant TWO because TWO is incorporated in the State of Maryland.  Additionally, TWO and UWM expressly and irrevocably consented to the subject-matter jurisdiction of this Court in Section 9.7(b) of the Merger

Agreement, which provides that the parties (i) "irrevocably submit to the jurisdiction of…the United States District Court for the State of Maryland, Northern Division…in any action or proceeding that arises in respect of the interpretation and enforcement of the provisions of this [Merger] Agreement and the documents referred to in this [Merger] Agreement" or in connection with the transaction, and (ii) "consent to and grant any such Maryland Court jurisdiction over the person of such parties and over the subject matter of such dispute." *Id.* at § 9.7(b).

12.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (c)(2) because TWO is incorporated in the State of Maryland and is therefore deemed to reside in this District. Venue is also proper under § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL BACKGROUND

**I.     The Competitive Auction Process and UWM's Selection as the Winning Bidder**

13.     TWO is a Maryland real estate investment trust that invests in mortgage servicing rights and agency residential mortgage-backed securities through its subsidiary RoundPoint Mortgage Servicing LLC ("RoundPoint").

14.     Management of TWO and UWMC have interacted from time to time through their participation in the mortgage industry and, in the ordinary course of business, have engaged in transactions with each other, including periodic acquisitions by TWO of UWMC's mortgage servicing rights.

15.     By late 2024, TWO was facing significant headwinds as a standalone company, including the prospect of diminishing competitiveness relative to larger-scale peers and mounting challenges accessing capital at attractive rates.

16.     In December 2024, UWMC submitted an initial non-binding proposal to acquire

TWO.  Despite initial discussions and a January 2025 revised proposal from UWMC, the parties did not reach a deal.

17.    On August 20, 2025, TWO settled a lawsuit brought by its former external manager Pine River and related entities. The settlement required TWO to make a cash payment of $375 million to resolve allegations of wrongdoing. This liability amounted to over a third of TWO's equity value and put tremendous pressure on TWO's ability to continue as an independent business.

18.    In October 2025, TWO's Board of Directors formed an Ad Hoc Committee of independent directors to oversee a strategic process.  The Ad Hoc Committee formally initiated a competitive auction.  As part of that process, TWO reached out to UWMC regarding its interest in a potential transaction.  Like other potential bidders, UWMC executed a non-disclosure agreement, received confidential information, conducted extensive due diligence, and submitted a transaction proposal.  Leadership of UWMC and TWO met in person at UWMC's Pontiac, Michigan headquarters to discuss potential deal terms. On December 12, 2025, after extensive discussions, UWM and TWO aligned on a formula for determining the consideration to be paid by UWM, which resulted in an exchange ratio of 2.3328 shares of UWMC's Class A common stock for each share of TWO common stock.  The Ad Hoc Committee then determined UWM's proposal to be superior to all other bids and unanimously authorized entry into an exclusivity agreement with UWM, and the parties proceeded to negotiate on an exclusive basis to finalize the Merger Agreement.

19.    CrossCountry was also an active participant in the auction process.  From October through December 2025, CrossCountry submitted multiple proposals.  On December 12, 2025, CrossCountry proposed an all-cash deal with an implied value of $12.16 per share based on TWO's

tangible book value of $10.67 per share.  TWO's Ad Hoc Committee and the full TWO Board unanimously found CrossCountry's proposal inferior to UWMC's proposal.

20.    Having conducted a full and fair auction and evaluated all competing proposals—including multiple bids from CrossCountry—the TWO Board, advised by independent legal and financial advisors, selected UWM as the winning bidder.  The TWO Board unanimously determined that the Merger Agreement and the transactions described therein were advisable and in the best interests of TWO's stockholders.  The Board's determination was informed, in part, by a fairness opinion from TWO's financial advisor, Houlihan Lokey, which opined that the terms of the UWM Merger were fair, from a financial point of view, to TWO's stockholders.  On December 17, 2025, TWO and UWM executed the Merger Agreement and jointly issued a press release announcing the deal.

21.    Later that day, CrossCountry submitted a further revised proposal, which included an increased price.  The TWO Board again unanimously found CrossCountry's offer inferior to the Merger Agreement, but determined that the CrossCountry offer could reasonably be expected to lead to a superior proposal and authorized TWO's management and advisors to enter into discussions with CrossCountry.

22.    On December 21, 2025, rather than respond to questions from TWO so that TWO's Board could better compare CrossCountry's offer to the Merger Agreement, CrossCountry informed TWO that it was withdrawing its offer.

**II.    UWM's Decision to Acquire TWO and the Expected Strategic Benefits**

23.    On January 30, 2026, UWMC filed a Registration Statement on Form S-4 (the "Registration Statement") with the Securities and Exchange Commission in connection with the transaction, attaching a copy of the Merger Agreement.  In the Registration Statement, UWMC stated that the UWM Merger would create sustainable long-term value for its stockholders.  Key

strategic benefits to UWM included:

- Strengthening UWMC's current market and competitive position as a world-class complete mortgage company;

- Delivering to UWMC's stockholders a financially attractive transaction that is accretive to earnings and book value and provides an opportunity for meaningful cost and revenue synergies;

- Positioning UWMC to meaningfully accelerate its transition to in-house servicing for its $216 billion unpaid principal balance of mortgage servicing rights ("MSRs") portfolio (as of September 30, 2025);

- Extending UWMC's leading industry positioning by expanding its servicing portfolio and capabilities, and positioning UWMC to deliver approximately $1 billion of recurring mortgage servicing revenues, on a pro forma basis;

- Expanding UWMC's approach to a balanced and stable cash flow in all interest rate environments by adding a servicing portfolio with a low weighted average loan rate (3.58% as of September 30, 2025) to the continued opportunity for UWMC's independent mortgage brokers to recapture origination from UWMC's legacy MSR portfolio;

- Capitalizing on UWMC's position as the largest home mortgage loan originator in the country coupled with TWO's assets to create significant opportunities for further capital efficiencies around financing, hedging, and secondary markets; and

- Materially increasing UWMC's public float to approximately 513 million shares, representing a 93% increase from UWMC's then-current float.  *See* Registration Statement at 47-48.

24.    Acquiring TWO's mortgage servicing rights ("MSRs") was a major driver, if not the crux, of the transaction for UWM. As disclosed in the Registration Statement, the size and scale of the combined company's mortgage servicing portfolio would be significant. UWM and TWO expected the combined company to service more than $400 billion in unpaid principal balance of MSRs. *See* Registration Statement at 48. As discussed below, MSRs can be impacted by changes in interest rates, which can fluctuate over time.

### III.    The Merger Agreement

25.    The Merger Agreement required TWO to merge with UWM Merger Sub, a wholly owned subsidiary of UWMC. The value of the UWM Merger to TWO's stockholders was based on a fixed exchange ratio pursuant to which each of TWO's common shares would be exchanged for 2.3328 shares of UWMC's Class A common stock, yielding an equity value of approximately $1.3 billion. The UWM Merger was expected to close in the second quarter of 2026, subject to the approval of TWO's stockholders and other customary conditions.

26.    The Merger Agreement imposed on TWO several obligations between signing (the "Signing") and closing the transaction (the "Closing"). In particular, TWO was required to:

(a)    Cease and terminate any and all discussions or negotiations regarding competing proposals. *Id.* § 6.3(a).

(b)    Not directly or indirectly initiate, solicit or encourage any inquiry or offer, or engage in any discussions with any person, or furnish any non-public information, in each case where any such action could reasonably be expected to lead to the making of a competing proposal. *Id.* § 6.3(b).

(c)    Keep UWM "reasonably informed" of developments relating to any competing proposals. *Id.* § 6.3(c).

(d)     "[S]olicit from the Company Stockholders[1] proxies in favor of the approval of the Merger [Agreement]."  Merger Agreement § 6.5.

(e)     Use "commercially reasonable efforts to promptly provide Parent with the requested voting tabulation reports" and "otherwise keep Parent reasonably informed regarding the status of the solicitation."  *Id.* § 6.5.

(f)     Provide UWM "reasonable access" to information necessary to get to Closing.  *Id.* § 6.6.

(g)     Use its "reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable under applicable Laws to consummate the UWM Merger and the other Transactions as soon as practicable."  *Id.* § 6.7(a).

27.     Closing was conditioned on receipt of the affirmative vote of the majority of votes entitled to be cast at the TWO Company Stockholders Meeting ("Company Stockholder Approval").  Merger Agreement § 7.1(a).  In other words, if the holders of just one more than 50% of the outstanding shares of TWO common stock voted to approve the UWM Merger, it would proceed.  This also meant that every share not voted would effectively be a vote against the UWM Merger.

28.     If between Signing and Closing and before receiving the Company Stockholder Approval, TWO received an unsolicited competing proposal that TWO's Board determined to be a Company Superior Proposal, the Merger Agreement required TWO to engage in good-faith

---

[1] All capitalized but undefined terms in this Complaint shall have the definitions given them in the Merger Agreement.

negotiations with UWM regarding revised terms of the Merger Agreement such that UWM's offer remained superior.  Merger Agreement § 6.3(d)(iii).

29.     Section 8.1(d) permitted TWO to terminate the Merger Agreement "in order to enter into a definitive agreement with respect to a Company Superior Proposal," *but only if* TWO first complied with its obligation to engage in good faith negotiations with UWM to allow UWM the opportunity to match any Company Superior Proposal.  Merger Agreement § 8.1(d).

30.     Section 8.3(a)(ii) required TWO to pay UWM a $25.4 million termination fee if TWO decided to terminate the Merger Agreement under Section 8.1(d) in favor of a Company Superior Proposal.  Merger Agreement § 8.3(a)(ii).  But Section 8.2(b) provides that, if TWO commits a willful breach of the Merger Agreement, then "no such termination shall relieve any party from liability for any damages" and UWM "shall be entitled to all rights and remedies available at law."  *Id*. § 8.2(b).

## IV.     TWO Turns Against the UWM Merger

31.     During the period when TWO was supposed to be working cooperatively with UWM to get to Closing, TWO learned that UWM did not intend to retain TWO's operations infrastructure or management team.  This fundamentally altered TWO's enthusiasm for the UWM Merger.

32.     TWO's management learned from CrossCountry or otherwise determined that, unlike UWM, CrossCountry would maintain the vast majority of TWO's existing operations post-closing.

33.     TWO made its dissatisfaction with UWM clear.  At one point during the Merger Agreement's non-solicitation period, TWO's CEO, William Greenberg, taunted UWM by

threatening to sell its servicing subsidiary, RoundPoint, to CrossCountry if UWM's management was not going to operate in his preferred manner.

## V.      TWO Deliberately Sabotages the Stockholder Solicitation Process

34.      TWO mailed its Proxy Statement to its stockholders on or about February 12, 2026 and set the stockholder meeting and vote on the Merger Agreement for March 16, 2026 (the "March 16 Meeting").

35.      In public-company mergers, obtaining stockholder approval requires a proactive, coordinated, and data-driven solicitation process.  Historically, only 60% of TWO stockholders voted in annual stockholder meetings. Given this, the solicitation effort would be especially important in order to obtain the Company Stockholder Approval.

36.      TWO's stockholder base consists of two principal groups—large institutional investors who actively monitor and vote on corporate transactions and a substantial number of individual investors who hold shares through brokers and nominees (the "Retail Investors").  Retail Investors are significantly less likely to vote without targeted outreach.  Reaching Retail Investors requires, at a minimum: (i) identifying the composition of the company's total stockholder base; (ii) securing a Non-Objecting Beneficial Owner ("NOBO") list (an official list of stockholders who hold stock through a broker or bank but do not object to the company knowing their identity, contact data, and share amount); (iii) conducting targeted outreach; (iv) tracking voting progress in real time; and (v) adjusting solicitation strategy based on voting returns.  TWO retained D.F. King, a proxy solicitor, purportedly to assist in this process.

37.      TWO flouted its obligations under Sections 6.5 and 6.7 of the Merger Agreement. In violation of its express obligations under Section 6.5, TWO failed to solicit from its stockholders proxies in favor of the UWM Merger, failed to use "commercially reasonable" efforts to promptly

provide UWM with regular voting tabulation reports, and failed to keep UWM reasonably informed about the status of the solicitation.

38.     In addition, TWO failed to do "all things necessary, proper or advisable" to consummate the UWM Merger, as required under Section 6.7(a).  Instead, TWO did virtually nothing to solicit its stockholders' votes and refused to involve UWM in any solicitation efforts. For example, TWO's management failed to solicit the Retail Investors' votes.  When asked why, Ms. Sandberg told UWM, on March 7, 2026, that "While the NOBO list can be easily be procured, it will be of extremely limited use under the circumstances.  The overwhelming majority of TWO stock is held by institutional investors."  Ms. Sandberg represented that Retail Investors constituted only "12-15% of [TWO's] outstanding shares."  She added, "Of that 12-15%, we are likely to get only a very small fraction of the stockholders' phone numbers—at best we maybe reach 1-2% of the O/S [outstanding] shares.   This is not the best use of time or resources at this point in the process."  In reality, as TWO has more recently acknowledged, approximately 30-35% of its stockholders are Retail Investors or require active solicitation.  This was nearly three times what Ms. Sandberg had represented and knew or was reckless in not knowing because that information was readily discernible from the company's records. The institutional-investor vote alone would therefore, as a practical matter, be insufficient to secure the Company Stockholder Approval—a fact that UWM would learn only later.  (TWO's knowledge of the composition of its stockholder base likely explains why it has retained additional proxy solicitation resources in seeking to push through the deal with its favored suitor, CrossCountry.)

39.     TWO also refused UWM's repeated requests to obtain a NOBO list.  Obtaining a NOBO list is essential to ascertaining the composition of the stockholder base and developing a solicitation strategy.  It is therefore one of the first steps—if not *the* first step—in any solicitation

effort.  Without the list, which only TWO could obtain, it would be a monumental hurdle to solicit enough votes to secure the Company Stockholder Approval.  Upon information and belief, TWO's resistance to obtaining the NOBO list was calculated to thwart the stockholder solicitation process.

40.     Although TWO ultimately agreed to obtain the NOBO list, it waited until just *days* before the March 16 Meeting and almost a month after TWO began mailing proxies to stockholders.  This foot-dragging had the intended effect. The March 16 Meeting was rapidly approaching and the number of votes cast was low.

41.     Given TWO and D.F. King's failure to cooperate, on March 7, UWM hired its own proxy solicitor, Okapi, in an urgent effort to secure the Company Stockholder Approval.  UWM proposed that Okapi work with TWO's proxy solicitor, D.F. King, to solicit votes.  Given the need for additional votes and the low number of votes cast so far, Okapi's additional resources were essential.  TWO refused to work with Okapi, citing an internal vendor management policy that TWO claimed barred it from engaging Okapi.  In reality, the policy allowed TWO's CEO or General Counsel to override the default prohibition; plus, the engagement was classified internally by TWO as low-risk.  Still, to remove even this excuse, UWM offered to cover the full cost of Okapi's involvement.  TWO still refused, asserting that TWO's stockholders would perceive Okapi's involvement to be a "conflict" which might "confuse" them.  Of course, in an uncontested solicitation, which this was, there is no conflict because TWO is required by the Merger Agreement to use its best efforts to secure the Company Stockholder Approval.  In hindsight, TWO's excuses were pretextual, designed to sabotage the stockholder vote.

42.     More than a week before the March 16 Meeting, UWM advised TWO's management that more effort was necessary to solicit and secure votes.  In a March 7, 2026 email, Ms. Sandberg acknowledged that D.F. King had advised that securing stockholder approval of the

Merger would be "challenging," but despite UWM's pushing, continued to resist getting the NOBO list.   Ms. Sandberg defended TWO's conduct while misrepresenting the universally accepted benefit of a NOBO list.   In the days that followed, TWO continued to resist UWM's offers and efforts to solicit and secure additional votes. Notwithstanding TWO and D.F. King's inaction, on the first day of its engagement, Okapi located phone numbers for 9,000 TWO stockholders that D.F. King had not, and, within days, Okapi located that information for 11,000 additional stockholders. This was something that TWO and D.F. King easily could have and should have done.

43.     As of March 16, 43.85% of TWO's outstanding shares had voted "FOR" the UWM Merger, largely as a result of UWM's efforts.  While only 6.15% shy of the Company Stockholder Approval threshold, the shortage of votes was exclusively a turnout issue because the "FOR" votes totaled 69.62% of all votes cast by that point.   Nonetheless, given the shortfall, UWM was left with no choice but to agree to an adjournment of the March 16 Meeting.   On March 16, 2026, TWO issued a press release announcing the adjournment of the March 16 Meeting to March 24, 2026 (the "March 24 Meeting").

44.     In the ensuing days, Okapi made independent efforts to solicit and secure additional votes.   Okapi's efforts yielded approximately 3.8 million additional "FOR" votes in just seven days.  This meant that the votes necessary to approve the UWM Merger were obtainable if TWO had performed as required under the Merger Agreement.   Indeed, by March 26, approximately 48% of TWO's outstanding shares had voted "FOR" the UWM Merger.  With approximately 33 million shares yet to vote, fewer than 2.4 million "FOR" votes were needed to reach the Company Stockholder Approval.   Given the pace at which Okapi was securing "FOR" votes, as of March 27, the parties were on the verge of obtaining the Company Stockholder Approval.

**VI.    TWO Deliberately Fails to Provide UWM "Reasonable Access" to Information or Take Other Actions Necessary to Close the Merger**

45.    The Merger Agreement required that, between Signing and Closing, TWO give UWM "reasonable access" to the information UWM requested and needed to consummate the merger, Merger Agreement § 6.6, including information needed to secure the Company Stockholder Approval.  This obligation was in addition to TWO's solicitation obligations under Section 6.5 and consummation obligations under Section 6.7.

46.    In the weeks leading up to the March 16 Meeting, UWM requested information and data regarding the proxy solicitation efforts, including the NOBO list. TWO promised to provide the information but repeatedly failed to do so.  TWO went even further, prohibiting D.F. King from meaningfully cooperating with UWM or providing the customary information and data UWM requested.

47.    Upon information and belief, TWO intentionally withheld solicitation information, prohibited D.F. King from cooperating with UWM, and resisted obtaining the NOBO list—all to frustrate the solicitation process and create the conditions under which the Company Stockholder Approval would not be obtained at the March 16 Meeting.

48.    Between execution of the Merger Agreement and its improper termination, TWO's management affirmatively represented to UWM that TWO was doing everything within its power to secure Company Stockholder Approval and advance the Closing.  In a March 7, 2026 email to UWM management, Ms. Sandberg wrote that TWO had been "at the table since December trying to do everything we can to make this transaction successful."  In truth, TWO was not making any meaningful effort to secure the Closing; it was actively working to derail it.

**VII.    TWO Knowingly Breaches the Non-Solicitation Provisions of the Merger Agreement**

49.    Section 6.3 of the Merger Agreement imposed strict non-solicitation obligations on TWO.  Section 6.3(a) required TWO to (i) cease all communications with CrossCountry regarding any bids, (ii) terminate CrossCountry's data room access, (iii) request the return or destruction of all non-public information given to CrossCountry, and (iv) cease providing any further information with respect to the Company to CrossCountry or its representatives.  Section 6.3(b) barred TWO from initiating, soliciting, encouraging, or engaging in any discussions with any Person or providing access to TWO personnel or documents, in each case, that could reasonably be expected to lead to the submission of a Company Competing Proposal.

50.    On March 17, 2026, just hours after TWO's announced adjournment of the March 16 Meeting, CrossCountry submitted an "updated" and "revised" bid (the "March 17 CrossCountry Bid") along with a draft merger agreement.  The March 17 CrossCountry Bid offered $10.70 per share, considerably less than CrossCountry's December 17, 2025 offer that the TWO Board rejected as inferior. CrossCountry also proposed to pay the $25.4 million Termination Fee that would be due to UWM if TWO decided the March 17 CrossCountry Bid was a Company Superior Proposal. The March 17 CrossCountry Bid also provided for an accelerated cash payment of lucrative "golden parachute" benefits to TWO's management upon closing, ensuring that the very individuals tasked with evaluating the bid would walk away with millions in cash at closing if they approved it.

51.    On March 17, 2026, TWO notified UWM of the March 17 CrossCountry Bid, and on March 19, TWO publicly disclosed it.

52.    The submission of CrossCountry's bid on the heels of the March 16 Meeting adjournment was not mere happenstance; it had been in process for some time.  The March 17

CrossCountry Bid required substantial advance preparation. Upon information and belief, the timing of CrossCountry's bid, coupled with TWO's deliberate inaction, foot-dragging, and information-withholding regarding the proxy solicitation process for the UWM Merger, reveals what really happened: TWO deliberately prevented solicitation of the necessary "FOR" votes for the UWM Merger by the March 16 Meeting because it was seeking to harm stockholder perception of the UWM Merger, and therefore maximize the positioning of the offer it had inappropriately solicited from CrossCountry. TWO admitted it was in daily communication with CrossCountry in the several weeks between signing the Merger Agreement and terminating it.

**VIII.    TWO Refuses to Engage With UWM's Improved Proposals and Willfully Breaches Its Good-Faith Negotiation Obligation**

53.     To terminate the Merger Agreement, Section 8.1(d) required TWO to (i) keep UWM "reasonably informed" of any developments regarding any competing proposal, and (ii) engage in good faith negotiations with UWM with respect to any revised proposals it may make. Merger Agreement §§ 6.3(c), (d)(iii).

54.     On March 21, 2026, TWO informed UWM by email that TWO had concluded the March 17 CrossCountry Bid was a Company Superior Proposal. Between receiving CrossCountry's bid and deeming it superior, TWO had cursory communications with UWM but made no attempt to meaningfully engage.

55.     Nonetheless, on March 22, 2026, UWM submitted a written proposal to TWO to amend the Merger Agreement. Under this proposal, UWM offered TWO's common stockholders $10.71 per share through a stock and cash consideration structure—i.e., more cash consideration (capped at $212.8 million), to the extent that $10.71 per share in value was not covered by the sale of the transferred UWM shares.

56.     On March 23, 2026, TWO unilaterally adjourned the March 24 stockholder meeting to April 7, 2026.

57.     On March 24, 2026, CrossCountry revised its bid, increasing the cash component to $10.80 per share. The proposed transaction would be financed in whole or in substantial part through a $2 billion credit facility, purportedly secured by MSRs, highly volatile assets whose fair market value is inversely correlated with interest rates.  Because CrossCountry's proposed deal would be highly leveraged and would require a complete restart of the regulatory process, it carried significant execution risk.

58.     Also on March 24, notwithstanding TWO's continued refusal to meaningfully engage, UWM sent a further enhanced written proposal to TWO.  Under its revised proposal, UWM offered TWO stockholders a guaranteed value of at least $10.95 per share.  Unlike its March 22 proposal, UWM offered unlimited cash consideration, to the extent UWMC stock did not yield $10.95 per share.  UWM's March 24 proposal was superior to CrossCountry's most recent offer— it offered a higher guaranteed floor price ($10.95 vs. $10.80), could have closed within weeks rather than months, required no new financing, carried no regulatory restart risk, and preserved for TWO's stockholders the full upside of ownership in the combined company.

59.     Along with its March 24 proposal, UWMC sent a letter to TWO, alleging that TWO had failed to comply with its obligations under the Merger Agreement, including with respect to the non-solicitation, proxy solicitation, and good faith negotiation provisions, and reserved UWMC's rights to pursue a competing offer or other remedies if TWO were to accept CrossCountry's competing proposal.

60.     TWO refused to talk with UWM regarding the proposals, much less negotiate in good faith.  No members of management, the Board, or TWO representatives would meaningfully

engage with UWM about which aspects of UWM's proposals TWO viewed favorably or unfavorably, how value to TWO's stockholders under UWM's proposals could be maximized, or the structure, timing, or other elements of the proposals.  Instead, after an initial perfunctory set of performative communications, TWO remained silent, in violation of its express obligations under the Merger Agreement and in complete disregard of its fiduciary duties to its stockholders.

61.	At this point, the UWM Merger was only a month from Closing, with all regulatory approvals expected by April 30. That should have weighed heavily in favor of completing the UWM Merger because it provided near-term certainty of value that the CrossCountry proposal could not match.  But to TWO's management, that did not matter. They had decided they wanted to deal with CrossCountry—not UWM—and would say and do whatever they needed to achieve that result.

62.	On March 25, TWO sent a letter to UWM, denying the allegations in UWM's March 24 letter—including that TWO had solicited CrossCountry's renewed bids—and asserting that it had complied with its obligations under the Merger Agreement.  Had TWO admitted then that it had solicited CrossCountry's re-entry into the deal process, UWM would have acted differently in its business and with the courts.

63.	On March 27, 2026, before UWM learned the truth, TWO notified UWM that it (i) was terminating the Merger Agreement, (ii) had decided to accept CrossCountry's proposal at $10.80 per share, (iii) had executed a merger agreement with CrossCountry, and (iv) was canceling the April 7, 2026 Meeting.

64.	TWO had chosen to jettison the near-term certainty of the UWM Merger in favor of a CrossCountry deal marred by delay and uncertainty and offered at a lower price.  Weeks later,

TWO would publicly denounce UWM's post-termination bids as causing potential delay and unacceptable uncertainty for TWO stockholders.  The hypocrisy was stunning.

65.    On April 10, 2026, TWO filed a preliminary proxy statement with the SEC regarding its contemplated transaction with CrossCountry (the "Preliminary Proxy Statement"). In it, TWO offered a specious explanation of why it believed UWM's March 22 and March 24 proposals were inferior to CrossCountry's March 24 bid.  But TWO never communicated that information to UWM.  UWM only learned it by reading the Preliminary Proxy Statement weeks after TWO terminated the Merger Agreement.

66.    On April 20, 2026, TWO filed a definitive proxy statement with the SEC, announcing that it would hold a stockholder meeting on May 19, 2026 to vote on the proposed merger with CrossCountry.

**IX.    TWO's Post-Termination Conduct Confirms Management's Entrenchment Motive**

67.    On April 20, 2026, UWM delivered a revised proposal to the TWO Board, offering TWO's stockholders a choice between (i) $11.30 per share in cash (a $0.50 premium to CrossCountry's then-pending $10.80); or (ii) 2.3328 shares of UWMC Class A common stock, the same fixed exchange ratio the Board had determined superior in December 2025 (the "April 20 Proposal").  TWO sought clarification regarding the April 20 Proposal and on April 24, 2026, UWM responded, including an executed financing commitment letter from Mizuho Bank, Ltd. for a $1.2 billion senior unsecured bridge facility.  Despite receiving this information, TWO refused to negotiate or further engage with UWM.  Notably, TWO did not require this level of financing commitment and certainty from CrossCountry until the strength of UWM's bid forced it to do so. The double standard to which TWO held UWM and CrossCountry only reinforces TWO's improper motives.

68. On April 27, 2026, CrossCountry amended its offer, increasing its cash consideration from $10.80 to $11.30 per share—a bare match of UWM's cash election—while simultaneously doubling the Company Termination Fee from $25.4 million to $50.0 million. In addition, TWO showed its true colors by agreeing with CrossCountry that if UWM (and only UWM) were ultimately to be the winning bidder, not only would the Company Termination Fee be $50 million, but TWO would suffer an additional penalty (which would be borne by UWM on Closing) of $25.4 million, for a total termination fee of $75.4 million, which equates to an unprecedented 6.4% of TWO's equity value. There is no justification for such an outrageous penalty other than for TWO and CrossCountry to try to lock up their wrongful deal by making it unreasonably expensive for UWM—the only other serious bidder—to compete.

69. Notwithstanding this egregious conduct, on April 30, 2026, UWM submitted a further revised proposal, increasing the cash election from $11.30 to $12.00 per share, while preserving the 2.3328 fixed exchange ratio for stockholders electing stock, supported by an increased $1.3 billion committed unsecured bridge facility from Mizuho (the "April 30 Proposal"). Concurrently, UWM issued an open letter to TWO's stockholders disclosing the terms of the April 30 Proposal and stating that the TWO Board had refused to negotiate, accepted from CrossCountry "the bare minimum to match what is essentially the floor value of our prior offer," and "ma[de] it harder for UWMC to offer you more value by agreeing to a higher termination fee with CrossCountry."

70. On May 3, 2026, without offering any counterproposal or substantively engaging with UWM, the TWO Board met and unanimously determined that the April 30 Proposal "was not, and could not reasonably be expected to lead to, a 'Company Superior Proposal.'" That determination is all the more suspect given TWO's prior willingness (both in December 2025 and

March 2026) to readily determine that an obviously inferior CrossCountry proposal could reasonably be expected to lead to a Company Superior Proposal.

71. On May 8, 2026, CrossCountry amended its offer again, increasing the cash consideration from $11.30 to $12.00 per share—a bare match of UWM's April 30 cash election, without even considering the benefit to TWO stockholders of the option value from the right to elect stock. Once again, the TWO Board did not secure any incremental value, certainty, or risk-shifting consideration for TWO's stockholders, but it did make competing incrementally harder, by increasing the termination fee payable to CrossCountry if UWM was the winning bidder from $75.4 million to $76.4 million.

72. On May 11, 2026, UWM publicly announced a further revised proposal increasing the cash election from $12.00 to $12.50 per share, while preserving the 2.3328 fixed exchange ratio for stockholders receiving stock. As with UWM's prior proposals, the cash election remained available to all TWO stockholders on a share-by-share basis, with no cap and no proration. Concurrently, UWM issued another open letter to TWO's stockholders, accusing the TWO Board of refusing to engage, stating that UWM remained open to considering amendments to its proposed terms, including a potential reverse termination fee and modifications to the cash-election mechanism, and asserting that the Board's refusal to engage was tied to "protecting a deal structure that ensures immediate cash payouts for Two Harbors management in the range of $35 million on the date of close instead of negotiating higher value for stockholders."

73. In the ensuing weeks, TWO, UWM and CrossCountry issued dueling press releases touting the merits of the competing UWM and CrossCountry proposals. TWO strongly favored the CrossCountry deal despite the clear superiority of UWM's offer. In fact, the nation's two leading proxy advisory firms and a separate proxy research service all independently

recommended that TWO stockholders vote "AGAINST" the CrossCountry deal.

74.     First, on May 11, 2026, Institutional Shareholder Services ("ISS"), a top proxy advisory firm that provides disinterested corporate governance data, analytics, and stockholder voting recommendations to institutional investors, recommended that TWO stockholders vote "AGAINST" the CrossCountry merger, stating that "the board has not capitalized on the competing bids from UWMC by engaging with the parties in a way that provides shareholders with assurance the best terms have been extracted."

75.     On May 13, 2026, Glass Lewis, the country's other leading proxy advisory firm, independently reached the same conclusion and recommended that TWO stockholders vote "AGAINST" the CrossCountry merger.

76.     In addition, on May 15, 2026, Egan-Jones Proxy Services ("Egan-Jones"), an independent proxy research firm, published a research report likewise recommending that TWO stockholders vote "AGAINST" the CrossCountry merger.  Egan-Jones advised that "[t]he Board's repeated refusal to engage with a higher, uncapped cash offer from UWMC remains the central issue" and concluded that "Two Harbors' refusal to engage with a higher revised bid undermines confidence that the Board pursued the best reasonably available outcome for shareholders."

77.     Like the independent advisory services, TWO's stockholders initially saw through TWO's attempt to cram down an inferior deal and refused to support the CrossCountry merger. On four separate occasions, TWO acknowledged its failure to secure the needed vote and repeatedly adjourned or postponed its stockholder meeting to buy time to garner more votes.  TWO adjourned the May 19 stockholder meeting to May 28, adjourned the May 28 meeting to June 11, postponed the June 11 meeting to June 23, and adjourned the June 23 meeting to July 2. Throughout this time, TWO worked arduously to convince its stockholders to accept the

CrossCountry deal—an effort TWO had willfully refused to undertake for UWM despite its crystal-clear contractual obligation. Ultimately, after multiple rounds of adjournment and delay— and only after TWO had exhausted every opportunity to pressure its stockholders—TWO's stockholders approved the CrossCountry merger at the July 2 meeting.

78.    Upon information and belief, throughout the deal process, TWO's management was motivated by a selfish desire to cash out massive executive benefits at closing. Concurrently with executing the Merger Agreement, TWO's Board and management had taken steps to accelerate cash and equity payments to Mr. Greenberg and other senior TWO officers totaling approximately $35 million, including: (i) paying accelerated 2025 cash incentive bonuses on December 26, 2025; (ii) accelerating vesting and settlement of restricted stock units that would otherwise have vested in the first quarter of 2026; and (iii) granting a $3.5 million restricted stock award to Mr. Greenberg, which would fully vest upon a termination without "cause" or for "good reason" following a change of control. TWO was determined to preserve and collect those benefits—and, with the benefit of the wrongfully solicited CrossCountry bid, to do so in cash.

79.    A merger with UWM would have frustrated that objective. Under the revised proposal from UWM, those benefits would have converted into UWMC Class A common stock at the 2.3328 exchange ratio, tying management's compensation to the performance of the combined entity, with no accelerated vesting and no immediate liquidity. In other words, management would have been paid in stock, not cash, and would have borne the same market risk as every other UWMC stockholder.

80.    A CrossCountry merger, by contrast, gave TWO's management exactly what it wanted. Under CrossCountry's conveniently timed March 17 proposal and those thereafter, management's outstanding equity awards would have their vesting accelerated and be fully paid

in cash at closing, providing immediate, certain liquidity unaffected by any post-closing relationship with the acquirer. And that is precisely what TWO's management secured when its stockholders finally approved the CrossCountry merger on July 2.

81. Given the lucrative payouts that would accompany a merger with CrossCountry and the expectation that management would lose their jobs and bonuses in a merger with UWM, TWO dragged its feet during the proxy solicitation process, withheld information, refused to engage with UWM regarding any of its post-March 16 proposals, and otherwise failed to act as contractually required. It is no surprise that each of ISS, Glass Lewis, and Egan-Jones independently criticized TWO's conduct as contrary to TWO stockholders' interests.

82. TWO inadvertently revealed management's troubling personal motivations during a confidential engagement meeting with ISS. As ISS reported, the TWO Board privately conceded to ISS that "UWMC's integration plan was only clarified after announcement of the initial merger agreement, and that this realization has led employees to express concerns about a transaction with UWMC." In other words, TWO's management only learned they were unlikely to keep their positions and exorbitant golden parachutes after TWO signed the Merger Agreement.

83. ISS recommended "AGAINST" TWO's merger-related compensation proposal, which was also set for an advisory stockholder vote, citing "significant concerns regarding the single trigger vesting of outstanding equity awards, which includes a recent grant made to the CEO of substantial value that was designed to vest over a three-year period." When TWO sought ISS's support for this proposal, ISS pressed these entrenchment issues and flagged the management conflict dynamic as a serious and insufficiently addressed governance concern.

84. Glass Lewis and Egan-Jones also recommended "AGAINST" the merger-related compensation proposal based on concerns that the severance package exceeded acceptable

thresholds, including single-trigger vesting of equity awards.

## CAUSES OF ACTION

### COUNT I
### (Breach of Contract)

85.    UWM repeats and realleges the allegations of paragraphs 1 through 84 above as if fully set forth herein.

86.    Under Section 8.2(b) of the Merger Agreement, UWM is entitled to damages above the Termination Fee for TWO's willful breaches of the Merger Agreement:

> [N]otwithstanding anything to the contrary herein, no such termination shall relieve any party from liability for ***any damages*** . . . for a ***willful breach of any covenant, agreement or obligation hereunder*** . . . in which case the aggrieved party shall be entitled to ***all rights and remedies available at law*** or in equity.

Merger Agreement § 8.2(b) (emphases added).  Under governing Maryland law, there is no limitation on TWO's liability where its breaches are willful.

87.    UWM and TWO entered into a valid, binding contract embodied in the Merger Agreement.

88.    TWO willfully breached the Merger Agreement, including, without limitation, Sections 6.3, 6.5, 6.6, and 6.7, by deliberately acting and, in some cases, deliberately failing to act, knowing its conduct would violate the Merger Agreement.

89.    TWO willfully breached Section 6.3(a) of the Merger Agreement by failing to cease and terminate all discussions with, and cease providing further information about TWO to, CrossCountry regarding a competing proposal.

90.    TWO willfully breached Section 6.3(b) of the Merger Agreement, including, without limitation, by directly or indirectly: (i) initiating, soliciting, inducing or knowingly encouraging, facilitating or assisting any inquiry or offer that could reasonably be expected to lead

to a Company Competing Proposal; (ii) participating in discussions that could reasonably be expected to lead to the making of a Company Competing Proposal; and (iii) furnishing non-public information about TWO and access to TWO personnel that could reasonably be expected to result in the making of a Company Competing Proposal.

91.     TWO willfully breached Section 6.3(c) of the Merger Agreement, including by failing to promptly advise UWM of inquiries that would reasonably be expected to lead to a competing proposal and failing to keep UWM reasonably informed with respect to any material developments regarding any such competing proposal.

92.     TWO willfully breached Section 6.5 of the Merger Agreement by failing to solicit proxies in favor of the UWM Merger, use commercially reasonable efforts to provide UWM with requested voting reports, and keep UWM reasonably informed regarding the status of solicitation.

93.     TWO willfully breached Section 6.6(a) of the Merger Agreement by failing to furnish UWM with information UWM reasonably requested concerning the affairs of TWO for the purpose of consummating the Merger, including the NOBO list.

94.     TWO willfully breached Section 6.7(a) of the Merger Agreement by failing to use reasonable best efforts to take or cause to be taken all actions necessary, proper, or advisable to consummate the Merger as soon as practicable.

95.     These breaches were material and went to the heart of UWM's bargain.

96.     UWM fulfilled its obligations under the Merger Agreement and was prepared to close the Merger.

97.     UWM is entitled to damages as a result of TWO's willful breaches, including the deprivation of the benefits of its bargain under the Merger Agreement.  Such benefits include, without limitation, cost and revenue synergies—including at least $150 million in annual run-rate

synergies that TWO and UWM jointly identified before executing the Merger Agreement, opportunities for further capital efficiencies UWM would have realized under the Merger, lost profits, and the opportunity to acquire each share of TWO common stock for 2.3328 shares of UWM stock, representing a loss of approximately $350 million.  The total amount of UWM's damages will be proven at trial.

**COUNT II**
**(Fraud)**

98.     UWM repeats and realleges the allegations of paragraphs 1 through 97 above as if fully set forth herein.

99.     Under Section 8.2(b) of the Merger Agreement, UWM is entitled to damages above the Termination Fee for TWO's intentional fraud:

> [N]otwithstanding anything to the contrary herein, no such termination shall relieve any party from liability for *any damages* . . . for . . . *intentional fraud* . . . in which case the aggrieved party shall be entitled to *all rights and remedies available at law* or in equity.

Merger Agreement § 8.2(b) (emphases added).  Under governing Maryland law, there is no limitation on TWO's liability where it has committed intentional fraud.

100.     TWO made at least three material misrepresentations to UWM in connection with the Merger: (1) on March 7, 2026, TWO falsely represented that Retail Investors comprised approximately 12%–15% of TWO's outstanding shares, when in truth they comprised approximately 35%; (2) on March 25, 2026, TWO falsely denied that it solicited CrossCountry or facilitated a Company Competing Proposal, when in truth TWO was in regular contact with CrossCountry to encourage its re-entry into the deal process; and (3) on March 7, 2026, TWO falsely represented that it was doing everything within its power to secure the Company Stockholder Approval and ensure the Closing, when in truth TWO was actively working to thwart

the Merger.  Each of these misrepresentations was material, knowingly or recklessly made, intended to deceive and did deceive UWM.

101.  TWO's misrepresentation about the composition of its stockholder base was material.  The votes of the Retail Investors were significant to achieving the Company Stockholder Approval.  Had UWM known the true percentage of Retail Investors among TWO's stockholders, UWM would have taken materially different actions to secure Company Stockholder Approval, including, without limitation, (a) supplementing its proxy solicitation efforts to target Retail Investors; (b) enforcing TWO's obligations under the Merger Agreement to solicit proxies to secure stockholder approval; and (c) taking appropriate action to require TWO's proxy solicitor, D.F. King, to coordinate with UWM's proxy solicitor, Okapi, to solicit Retail Investors.

102.  TWO knew, or at minimum recklessly disregarded, that its representations regarding the Retail Investor percentage were false and misleading at the time they were made.  TWO knew the true composition of its own stockholder base or could have ascertained it with minimal effort.

103.  TWO's misrepresentation that it had not solicited a competing bid from CrossCountry was material.  Any communications in connection with, or reasonably expected to result in, a Company Competing Proposal materially implicated UWM's rights under the Merger Agreement, including the non-solicitation provisions of Section 6.3.  Had UWM known the truth about TWO's communications with CrossCountry, UWM would have, among other things, taken immediate action to enforce TWO's compliance with Section 6.3 of the Merger Agreement and prevent TWO's improper termination of the Merger Agreement.  In that event, UWM would not have incurred substantial advisor fees and expenses engaging in a post-March 16 bidding war.

104.  TWO knew the substance and purpose of its communications with CrossCountry

and deliberately concealed that those communications concerned, or at the very least, could reasonably be expected, to result in a Company Competing Proposal.

105.    TWO's misrepresentation that it was doing everything within its power to secure Company Stockholder Approval and advance the Closing was material. Had UWM known that TWO was not genuinely pursuing the Closing—and was instead facilitating a competing transaction—UWM would have taken immediate action to enforce TWO's obligations under the Merger Agreement, including the covenant to use reasonable best efforts to consummate the UWM Merger.

106.    TWO knew its representations regarding its efforts to achieve stockholder approval and advance the Closing were false at the time they were made.  TWO's conduct after termination of the Merger Agreement confirmed that TWO had been working to sabotage the UWM Merger in favor of a deal with CrossCountry.  During the post-termination bidding war, TWO actively solicited stockholder votes in favor of the CrossCountry transaction—a transaction that the nation's leading proxy advisory firms recommended against—and ultimately secured stockholder approval on July 2, 2026 only after four adjournments and months of intensive solicitation.  TWO's conduct demonstrates that TWO was willing and able to undertake aggressive solicitation efforts when it wished to do so, and that its failure to do so on behalf of the UWM Merger was deliberate.

107.    TWO intended to mislead, and did mislead, UWM regarding the true composition of TWO's stockholder base, the substance of its communications with CrossCountry, and the efforts it was undertaking to secure Company Stockholder Approval and advance the Closing. TWO made these representations to thwart stockholder approval of the UWM Merger and prevent UWM from taking action to (a) enforce its rights under the Merger Agreement and (b) stop TWO's improper termination of the Merger Agreement.

108.    UWM justifiably relied on TWO's material misrepresentations.  The Merger Agreement imposed on TWO express obligations to keep UWM "reasonably informed" regarding the status of the solicitation (Section 6.5) and developments relating to any competing proposals (Section 6.3(c)), and to use reasonable best efforts to "do all things necessary, proper or advisable" to consummate the UWM Merger (Section 6.7(a)).  UWM could not independently ascertain the true composition of TWO's stockholder base, the substance of TWO's communications with CrossCountry, or the extent of TWO's internal efforts (or lack thereof) to consummate the Merger.

109.    TWO's fraudulent misrepresentations caused the improper termination of the Merger Agreement and forced UWM to incur millions of dollars in financing costs, regulatory costs, and third-party advisor costs pursuing a post-termination transaction with TWO.  Had TWO truthfully disclosed the Retail Investor composition, the nature and extent of its communications with CrossCountry, and its lack of any meaningful effort to consummate the UWM Merger, UWM would have, among other things, sought an injunction to stop the CrossCountry bidding process and termination of the Merger Agreement.  Instead, in reasonable reliance on TWO's misrepresentations, UWM—believing TWO's termination of the Merger Agreement was permitted under Section 8.1(d)—accepted the termination fee and engaged in the post-termination bidding contest with CrossCountry.

110.    UWM was injured as a result of its reliance on TWO's intentional misrepresentations of material fact and suffered damages as a result, including, without limitation, financial and legal advisor costs, financing costs, and regulatory costs associated with the post-termination bidding contest.  The total amount of UWM's damages will be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, UWM respectfully requests judgment and relief as follows:

A. That the Court find that TWO has willfully breached the Merger Agreement;

B. That the Court find that TWO defrauded UWM by making material misrepresentations knowing that UWM would reasonably rely upon the truth of such representations;

C. That the Court award UWM appropriate legal damages, including the lost benefit of the Merger Agreement and all out-of-pocket costs and expenses incurred in the post-termination bidding contest, in an amount to be determined at trial; and

D. That the Court award such other necessary and proper relief, including, without limitation, pre-judgment and post-judgment interest, and costs, as the Court may deem just and proper.

Dated: August 10, 2026

Respectfully submitted,


/s/ *Jeffrey E. Gordon*

Jeffrey E. Gordon (#023264)
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Telephone: (202) 383-5300
Email: jgordon@omm.com

David Marroso (*pro hac vice* forthcoming)
Trevor Garmey (*pro hac vice* forthcoming)
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 8th Floor
Los Angeles, CA 90067
Telephone: (310) 553-6700
Email: dmarroso@omm.com

Amy S. Park (*pro hac vice* forthcoming)
Jolie Leung (*pro hac vice* forthcoming)
O'MELVENY & MYERS LLP
2765 Sand Hill Road
Menlo Park, CA 94025
Telephone:     (650) 473-2600
Email: apark@omm.com
          jolieleung@omm.com