**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
(Northern Division)**

UWM HOLDINGS CORP., *et al.*,

Plaintiffs,

v.

TWO HARBORS INVESTMENT CORP.,

Defendant.

TWO HARBORS INVESTMENT CORP.,

Counterclaimant,

v.

UWM HOLDINGS CORP.,

Counterclaim-Defendant.

Civil Action No. 1:26-cv-03125-RDB

**DEFENDANT AND COUNTERCLAIMANT, TWO HARBORS INVESTMENT CORP.'S, COUNTERCLAIMS AND ANSWER TO <u>PLAINTIFFS' COMPLAINT AND JURY TRIAL DEMAND</u>**

# TABLE OF CONTENTS

*Page*


PRELIMINARY STATEMENT ........................................................................................1

THE PARTIES..........................................................................................................7

JURISDICTION AND VENUE ....................................................................................7

FACTUAL ALLEGATIONS .......................................................................................8

I. UWM Sought To Acquire TWO..............................................................................8

A. The Initial Bidding War For TWO. ..........................................................8

B. The UWM Merger Agreement.................................................................13

C. The Proxy Solicitation Process. ...............................................................15

II. UWM Breached The UWM Merger Agreement. ..................................................18

III. CCM Acquired TWO.........................................................................................20

A. CCM Made An All-Cash Proposal With Secured Financing. ...................20

B. TWO's Board Executed A Merger Agreement With CCM And Terminated The Merger Agreement With UWM. ....................................21

IV. UWM Tried To Disrupt And Prevent CCM From Acquiring TWO. ....................24

A. UWM Engaged In A Highly Inflammatory And Deceptive Media Campaign Against TWO.............................................................24

B. UWM Waged A Misleading Proxy Campaign Against The CCM-TWO Transaction...........................................................................29

C. TWO Obtained A Waiver So It Could Engage Directly With UWM But UWM Failed To Submit Any Proposal. ..................................34

V. UWM Defrauded TWO And The Investing Public. ............................................37

A. UWM Did Not Have The Practical Ability To Close A Merger With TWO. ..............................................................................37

B. UWM Made A Massive, Failed Derivative Bet And Its Finances Collapsed..........................................................................39

C. UWM Obtained Distressed Financing From Oaktree...............................42

VI. TWO's Reliance And Damages. ....................................................... 44

COUNT I BREACH OF CONTRACT ....................................................... 45

COUNT II FRAUD ....................................................... 49

COUNT III NEGLIGENT MISREPRESENTATION ....................................................... 62

PRAYER FOR RELIEF ....................................................... 64

DEMAND FOR JURY TRIAL ....................................................... 64

ANSWER TO PLAINTIFFS' COMPLAINT ....................................................... 65

DEFENSES ....................................................... 83

DEMAND FOR JURY TRIAL ....................................................... 87

Defendant and Counterclaimant, Two Harbors Investment Corp. ("TWO"), by and through its undersigned counsel, hereby brings these Counterclaims against Plaintiff and Counterclaim Defendant UWM Holdings Corp. ("UWM"), and alleges as follows:

**PRELIMINARY STATEMENT**

1. TWO was a publicly traded real estate investment trust ("REIT") focused on investments in mortgage-servicing rights ("MSRs") and residential mortgage-backed securities. TWO's business, among other things, included an efficient, low-cost mortgage-servicing operating platform, RoundPoint Mortgage Servicing LLC ("RoundPoint"), with approximately 900,000 customers. TWO recently closed an all-cash merger with CCM[1] for $12 per TWO share plus a pro-rata dividend totaling approximately $12.21 per TWO share.

2. In December 2025, however, TWO had agreed to a stock-for-stock merger with UWM, because TWO was led to believe—based on UWM's representations and public statements, including as filed with the SEC—that UWM was interested in acquiring RoundPoint, combining TWO and UWM's operations, and achieving $150 million of synergies from combined operational efficiencies and improved capital markets executions. On the day the UWM merger was announced, UWM stock traded at $5.12 per share, so the UWM stock merger consideration (which was a fixed exchange ratio from UWM's stock price) was worth $11.94 per TWO share to TWO stockholders.

3. Shortly afterwards, UWM's stock price collapsed from $5.12 per share to approximately $3.50 per share—a ***more than 30% drop*** that resulted in merger consideration valued at only $8.16 per TWO share. An independent proxy advisory firm, Institutional

[1] "CCM" includes CrossCountry Mortgage, LLC, CrossCountry Intermediate Holdco, LLC, and CrossCountry Holdco, LLC.

Shareholder Services ("ISS"), refused to recommend the UWM Merger, and, at the announced date of the shareholder meeting, a majority of TWO's stockholders did not vote to approve a UWM merger. $8.16 per TWO share was, at that time, roughly 25% below TWO's book value per share, *i.e.*, what the stockholders could receive if the company sold all of its assets and returned the money to stockholders.

4. Recognizing this economic reality, CCM entered the scene and submitted to TWO an unsolicited, all-cash merger proposal (fully backed by a financing commitment letter from a leading national bank) of $10.80 per TWO share, which was ***more than 30% above*** the value of the UWM stock merger consideration and also above TWO's fully diluted tangible book value. TWO fully complied with the requirements under the UWM merger agreement regarding unsolicited superior proposals, including by notifying UWM and giving UWM the right to match CCM's proposal. When it became clear that UWM was unable and/or unwilling to match CCM's proposal, TWO terminated the UWM merger agreement, entered into a merger agreement with CCM for an all-cash, fully financed deal, and UWM was paid a $25.4 million termination fee. However, unbeknownst to TWO, when the $25.4 million termination fee was paid to UWM, UWM had already willfully and intentionally materially breached the UWM merger agreement. Had that been disclosed to TWO, TWO would have been permitted to terminate the UWM merger *without payment of any fee*.

5. UWM's intentional undisclosed breaches and chicanery were just one part of the mountain of misconduct and fraud perpetrated by UWM and its principals on TWO and the investing public. Immediately after UWM pocketed the $25.4 million, it then embarked on a highly inflammatory public relations and proxy campaign against the TWO-CCM merger filled with lies and misstatements.

6. In what may be one of the most brazen lies perpetrated in modern corporate America, it appears that UWM *never* actually intended or had the ability to close a merger with TWO or to achieve any of the synergies it trumpeted. UWM professed to TWO, the public, stockholders of both UWM and TWO, and the SEC that the merger with TWO would result in significant benefits to the combined company—including $150 million in synergies and a combined company that would be a top eight servicer with over $1 billion in recurring servicing revenues and the ability to take advantage of TWO's financing, hedging and secondary markets strategies. UWM portrayed those benefits as real for months, including in its December 2025 investor presentations and on conference calls, in January 2026 meetings with investors, in March 2026 public filings and investor meetings, and in April 2026 written responses to TWO's questions. But after TWO terminated the merger agreement and entered into a new merger agreement with CCM in March 2026, UWM abruptly reversed position, publicly stating that there were no operating synergies to be had, and that the "best in class" capital markets team at TWO that UWM had acknowledged in December 2025 was now supposedly worth "zero." Instead, UWM asked the market to believe that the only value it saw in TWO was its MSR assets, which were held on TWO's books at their market price. UWM even asked the market to believe that all it ever wanted to buy from TWO were those MSR assets, even though UWM had never bought MSRs from anybody in the history of UWM, and UWM had been the market's largest seller of MSRs for several years.

7. Most egregiously, unbeknownst to TWO or its stockholders before termination of the UWM merger agreement, UWM's finances were fast deteriorating—UWM was highly leveraged, bleeding cash, and its equity value was falling—and it gambled that it could turn things around by taking a massive ***$27.5 billion notional*** bet that interest rates would fall. But that bet

failed. After UWM announced its gargantuan Q2 2026 loss of ***more than $740 million***, it needed to provide some justification for why it made such a massive bet on the direction of interest rates that had gone so badly wrong. To that end, UWM concocted a scheme to keep the fiction of a potential merger with TWO alive so it could falsely claim that the trade was a "pre-hedge" of TWO's MSR portfolio, even though UWM publicly and repeatedly represented for years that "[w]e do not hedge MSRs." Remarkably, UWM peddled its fraudulent "pre-hedge" fiction even *after* its transaction with TWO had been terminated, *after* it knew that TWO's MSR portfolio had been fully hedged by TWO consistent with its longstanding hedging policy, *after* it had taken payment of a $25.4 million termination fee (which it now must reimburse), and *after* TWO executed a binding merger agreement with CCM to acquire that same pool of MSRs. This justification does not pass the straight-face test. TWO's reputation in the marketplace is that it was one of the leading experts in hedging mortgage-backed securities and MSRs. Indeed, TWO's own disclosures showed not only that its portfolio was well-hedged both at the end of December 2025 and at the end of March 2026—and UWM acknowledged TWO's hedging expertise as something that would benefit the combined company in its December 2025 investor presentation—but that the size of the interest-rate exposure required to hedge was lower than what UWM "hedged" by more than an order of magnitude. That UWM tried to masquerade its $27.5 billion bet that interest rates would fall as a hedge of TWO's mortgage portfolio was therefore even more preposterous.

8. When interest rates went up instead of down and UWM's speculative bet turned against it, UWM took a ***$741 million total loss*** and was forced to obtain distressed, rescue financing from Oaktree Capital Management, L.P. ("Oaktree") on highly unfavorable terms, including an effective interest rate of at least 20% per year. When the full news broke on August 5,



DMFIRM #4922-6685-0518 v1

2026, UWM's stock price cratered another 35% and a slew of investor lawsuits were quickly filed by UWM's shareholders who have seen their investment decline by almost 80% over the last year. Fitch promptly downgraded UWM's credit rating to "junk," and Moody's put it on credit watch negative.

9. UWM must compensate TWO for its misconduct, which includes breaching the TWO-UWM merger agreement. The agreement, like most merger agreements, contained an ordinary-course covenant, in which UWM agreed to conduct its business in all material respects in the ordinary course between signing and closing. UWM has now admitted that it failed to do so: UWM put on an outsized, speculative $27.5 billion interest-rate trade outside the ordinary course of business during Q1 2026, likely in March, and did not disclose the existence of the trade until May 11, 2026. UWM's disclosure was not sufficient for any third party to determine what the trade entailed or the potential magnitude of exposure resulting from such trade until well after TWO terminated the agreement and UWM was paid a $25.4 million termination fee. UWM's interest-rate trade also had a "Material Adverse Effect" on UWM's business, as demonstrated by the fact that UWM then needed rescue financing. As a result of these breaches, UWM would not have been able to satisfy the closing conditions of its merger agreement with TWO. Because the interest-rate trade had a Material Adverse Effect on UWM's finances and business, UWM also breached the notification covenant in the merger agreement by failing to tell TWO about it.

10. To put the size of the trade in perspective, $27.5 billion is more than 10 times the market cap of UWM. The risk exposure amounted to a gain or loss of approximately $15 million for every one basis point that interest rates were to rise or fall, while TWO's own disclosures showed that its interest rate sensitivity was approximately $1.4 million per basis point ***assuming the portfolio was not hedged (which it was)***. In fact, because of the hedges that TWO had on its

books, the interest rate sensitivity of TWO's portfolio was just $0.2 million per basis point. If TWO had known about UWM's highly speculative and massive interest-rate trade in breach of the ordinary-course covenant, TWO would promptly have terminated the agreement without having to pay the termination fee. Put differently, UWM's breach and lies caused significant harm to TWO and improper benefit to UWM, including payment of the $25.4 million termination fee to terminate the agreement. These Counterclaims seek, among other things, reimbursement of the $25.4 million termination fee, which was wired to UWM on March 31, 2026.

11. UWM must also compensate TWO for UWM's fraudulent omissions and misstatements. As demonstrated below, both the original TWO-UWM stock-for-stock merger and UWM's later proposals were all premised upon, among other things, UWM's promises to TWO that combining TWO's and UWM's mortgage servicing businesses would result in significant benefits to the combined company—including $150 million in synergies and a combined company that would be a top eight servicer with over $1 billion in recurring servicing revenues and the ability to take advantage of TWO's financing, hedging and secondary markets strategies—and that UWM had sufficient financial wherewithal and liquidity to actually close a transaction with TWO.

12. Subsequent events and admissions from UWM have shown that UWM was perpetrating a huge fraud when it intentionally and/or recklessly made those statements to TWO, TWO's stockholders, and UWM's stockholders. In particular, UWM concealed its massive interest-rate trade, which had a material adverse effect on UWM's finances and business before closing, from TWO. Had TWO known the truth about UWM's financial condition and its true intentions—that is, to take advantage of TWO's equity so that the Ishbia family (which controls UWM) could continue to siphon $600 million per year in dividends, as well as the cover it would provide for UWM's reckless risk management practices permitting a massive gamble on interest

rates in early 2026—TWO would never have transacted or negotiated with UWM. Like a shark that must keep moving to avoid death, UWM's structure required constant capital infusion to sustain itself while the Ishbia family extracted billions.

13. To right these wrongs, TWO is entitled to the return of the $25.4 million termination fee, compensatory damages, and punitive damages for UWM's fraudulent conduct.

## THE PARTIES

14. TWO is a Maryland corporation with its principal place of business in St. Louis Park, Minnesota. Before its merger with CCM, TWO was a publicly traded REIT focused on investments in MSRs, residential mortgage-backed securities ("RMBS"), and related assets. TWO operated its mortgage-servicing business through its wholly owned subsidiary, RoundPoint, one of the nation's largest non-bank mortgage servicers. William Greenberg ("Greenberg") has served as TWO's CEO, President, and a director since 2020. Stephen G. Kasnet ("Kasnet") has served as the Chairman of the Board of Directors (the "Board") of TWO since 2018 and served as a director of TWO since 2009. On August 25, 2026, TWO was acquired by CCM.

15. UWM is a Delaware corporation with its principal place of business in Pontiac, Michigan. It is the publicly traded indirect parent of United Wholesale Mortgage, LLC. UWM is the largest publicly traded wholesale mortgage lending company in the United States. Mat Ishbia ("Ishbia") is the CEO, President, and Chairman of the Board of Directors of UWM. The Ishbia family controls the majority of the equity and voting rights of UWM.

## JURISDICTION AND VENUE

16. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332(a)(1), because the parties are citizens of different states and the amount in controversy exceeds $75,000.

17. This Court has supplemental subject-matter jurisdiction over this action under 28 U.S.C. § 1367, because these Counterclaims arise from the same negotiations, agreements, representations, and events at issue in the Complaint and form part of the same case or controversy.

18. This Court has personal jurisdiction over UWM because UWM filed the Complaint in Maryland and thus consented to the personal jurisdiction of this Court. This Court also has personal jurisdiction over UWM because (1) UWM purposefully availed itself of the laws of the State of Maryland by transacting with TWO, bidding for TWO, and making statements directed to TWO's stockholders; and (2) UWM's conduct was directed at TWO and its stockholders in Maryland such that it was reasonably foreseeable that TWO would suffer harm in Maryland.

19. Venue is proper in this District because UWM filed the Complaint in this District, and thus consented to venue in this District. Venue is also proper under 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to the Counterclaims occurred in this District.

## FACTUAL ALLEGATIONS

### I. UWM SOUGHT TO ACQUIRE TWO

#### A. The Initial Bidding War For TWO.

20. On or about November 19, 2024, Ishbia had breakfast with Greenberg. During breakfast, Ishbia told Greenberg that he "knew about making loans," but did not know much about the rest of the mortgage business, meaning capital markets, capital structure, and hedging. Greenberg replied that he was not an expert in making loans but was an expert in the rest of the mortgage business, including capital structure and capital markets. Ishbia and Greenberg agreed that, in light of these potential synergies, it would make sense to explore a potential merger of both companies.

21. On December 9, 2024, UWM sent TWO an unsolicited, preliminary non-binding proposal letter proposing to acquire TWO in a stock-for-stock merger with a fixed exchange ratio

of 1.05x. TWO's Board engaged with UWM and retained Jones Day as outside counsel and Houlihan Lokey as outside financial advisor. UWM submitted several proposals to acquire TWO and the Board, with the assistance of Jones Day and Houlihan Lokey, concluded that none of them were satisfactory.[2]

22. As TWO continued to receive proposals from UWM and additional unsolicited proposals from other potential buyers, the Board formed an ad hoc committee (the "Ad Hoc Committee") consisting of three independent directors with decades of financial experience, including Kasnet, to oversee the exploration of any potential transactions. The Ad Hoc Committee directed Houlihan Lokey to contact potential bidders, including UWM and CCM, to gauge their interest in pursuing a potential transaction with TWO. On October 14, 2025, TWO and CCM entered into a non-disclosure agreement and CCM received confidential information so it could evaluate a potential transaction. On October 24, 2025, TWO and UWM entered into a non-disclosure agreement (the "NDA"; Ex. 1) and the parties began exchanging confidential diligence information.[3]

23. On December 2–3, 2025, Greenberg, Kasnet, and TWO Chief Legal Officer Rebecca Sandberg flew to Detroit, Michigan to meet with the entire UWM management team, including Ishbia, and tour UWM's office complex. On December 2, Greenberg and Kasnet had dinner with UWM senior executives. During dinner, Ishbia, Blake Kolo, and Matt Roslin of UWM represented to TWO that they wanted to acquire TWO, which would achieve synergies, and that TWO's expertise in capital structure and capital markets would greatly help a combined company.

24. From October through December 2025, UWM and CCM both conducted extensive diligence and made multiple proposals to acquire TWO. UWM's final proposal offered to acquire

---

[2] Two Harbors Investment Corp., Definitive Proxy Statement at 23–24 (Apr. 20, 2026) (the "April 20 Proxy").

[3] April 20 Proxy at 25–26.

TWO in exchange for newly issued UWM Class A Common Stock at 1.175x fully diluted tangible common book value per share as of September 30, 2025. CCM's final bid offered to acquire TWO on an all-cash basis at a price range of 1.15x fully diluted tangible common book value per share. On December 16, 2025, the Ad Hoc Committee determined, in consultation with Jones Day and Houlihan Lokey, that CCM did not provide sufficient "information to allow for an evaluation of CCM's financing sources or progress to obtain such financing." Considering all of the factors, the Ad Hoc Committee recommended approving a merger with UWM.[4]

25. On December 17, 2025, TWO's full Board met with Jones Day and Houlihan Lokey to consider the merger with UWM. Houlihan Lokey orally issued a fairness opinion (later confirmed in writing), and the Board unanimously agreed with the Ad Hoc Committee and entered into a merger agreement with UWM (the "UWM Merger Agreement"; Ex. 2).[5] As described in the prospectus/proxy statement from UWM that was mailed to TWO shareholders and publicly filed with the SEC, this decision was based on UWM's representations that the merger would result in significant benefits to the combined company, including $150 million in synergies and a combined company that would be a top eight servicer with over $1 billion in recurring servicing revenues and the ability to take advantage of TWO's financing, hedging and secondary markets strategies. It also reflected the limited information then available to the Board and its advisors, which were unaware of certain aspects of UWM's deteriorating financial condition because UWM refused to provide detailed financial information regarding its MSRs. TWO's approval did not establish that UWM had the financial capacity to close a later all-cash transaction and necessarily did not account for UWM's later derivative position and margin exposure. (*See infra* Section V.B.)

---

[4] April 20 Proxy at 25–32.
[5] April 20 Proxy at 32.

26. Later on December 17, 2025, UWM issued a press release announcing the deal, which was also publicly filed with the SEC. (Ex. 3.) UWM represented that "[t]his transaction is expected to provide UWM with (i) ***expanded servicing expertise*** and scale as it continues to expeditiously bring servicing in-house, (ii) a high-quality $176 billion UPB MSR portfolio, nearly doubling its existing MSR portfolio to approximately $400 billion, which will create significant recurring revenues, and (iii) ***the opportunity for approximately $150 million of cost and revenue synergies*** on an annual basis to help drive meaningful earnings accretion." (*Id.* (emphasis added).) UWM also represented that it "[e]xpect[s] further efficiencies around financing, hedging and secondary markets from TWO's proven capital markets expertise and UWM's scale," and the "[o]pportunity for ***meaningful cost and revenue synergies***." (*Id.* at 1–2 (emphasis added).)

27. Also on December 17, 2025, UWM gave an investor presentation in support of the TWO-UWM merger, which was publicly filed with the SEC. (Ex. 4.) UWM represented that the "Combination of leading Origination and Servicing franchises" and the "accelerate[d] transition of servicing in-house" provided "a highly compelling and strategic transaction." (*Id.* at 4.) UWM specifically highlighted TWO's "servicing portfolio" and "RoundPoint Overview" in its "TWO Harbors Overview." (*Id.* at 5.) UWM also represented that the transaction would create the "[o]pportunity for ***meaningful expense and revenue synergies***," result in "***synergies from this transaction***," create a "top 8 servicer," accelerate "UWM's transition of servicing in-house," and benefit from "TWO's high-quality servicing portfolio and servicing operation." (*Id.* at 7–8 (emphasis added).) UWM provided an entire slide about the "***approximately $150mm in annual potential synergies***," including cost savings from operating expenses, servicing, and financing, and revenue synergies. (*Id.* at 10 (emphasis added).) UWM's representations that "the acquisition

would generate about ***$150 million in annual cost and revenue synergies***" were widely reported in the financial press.[6]

28. Over the next three months, UWM repeatedly presented the transaction both to TWO and to the market as a genuine operating combination that would achieve "synergies" and "efficiencies," not merely an acquisition of an MSR servicing book, including in its:

- **January 30, 2026 Form S-4:** "UWMC believes that there are ***significant benefits and synergies*** that may be realized through leveraging the processes and scale of UWMC and Two Harbors," by seeking to "integrate the operations and business of Two Harbors into its existing business in an efficient and timely manner, to combine systems and management controls and to integrate relationships with industry contacts and business partners." UWM listed as "UWMC's Reasons for the Merger" that merging with TWO "provides the opportunity to realize ***meaningful cost and revenue synergies***." (Ex. 5 at 24, 47–48 (emphasis added).)

- **February 12, 2026 Prospectus:** In TWO's prospectus, UWM repeated the same representations regarding "synergies" from its January 30 disclosure. (Ex. 6 at 25, 49–50.)

- **February 25, 2026 FY 2025 Form 10-K:** "We believe that there are ***significant benefits and synergies*** that may be realized through leveraging the processes and scale of UWMC and Two Harbors" by seeking "to integrate the operations and business of Two Harbors into our existing business in an efficient and timely manner, to combine systems and management controls and to integrate relationships with industry contacts and business partners." (Ex. 7 at 16 (emphasis added).)

- **February 25, 2026 Q4 2025 Earnings Call:** Ishbia described "the pending Two Harbors acquisition and process of bringing servicing in-house" to create "a closed-loop platform that will help position us to accelerate broker channel growth and drive consumer retention for us and the channel." UWM's CFO similarly referred to "bringing servicing in-house and completing the Two Harbors acquisition to further strengthen our business for long-term growth and success." (Ex. 8 at 4, 6–7.) In the accompanying presentation, UWM identified "***$150mm annual potential synergies***" from the planned merger with TWO with improved "In-House Servicing." (Ex. 8 at 8 (emphasis added).)

---

[6] Prakhar Srivastava, *Mortgage lender UWM Holdings to buy Two Harbors Investment in $1.3 billion deal*, Reuters (Dec. 17, 2025), https://www.reuters.com/business/mortgage-lender-uwm-holdings-buy-two-harbors-investment-13-billion-deal-2025-12-17/ (emphasis added); Flávia Furlan Nunes, *Exclusive: UWM's Blake Kolo break down the strategy behind the Two Harbors deal*, HousingWire (Dec. 18, 2025), https://www.housingwire.com/articles/uwm-two-harbors-acquisition-2/; Maham Fatima, *UWM Holdings to Acquire Two Harbors in $1.3B All-Stock Merger to Create Mortgage Servicing Giant*, Yahoo! Finance (Dec. 28, 2025), https://finance.yahoo.com/news/uwm-holdings-acquire-two-harbors-174626181.html.

- **March 11, 2026 Investor Presentation:** UWM represented to TWO stockholders that it expected "[a]dditional value from ***~$150M of cost synergies*** expected to be realized," and that "UWM's #1 origination capability [will] complement TWO's servicing platform and servicing portfolio." (Ex. 9 at 3.)

**B. The UWM Merger Agreement.**

29. The UWM Merger Agreement included a standard ordinary-course covenant (the "Ordinary-Course Covenant") in which UWM agreed that, between signing and closing of the merger, UWM would "use commercially reasonable efforts to [] conduct its businesses in all material respects in the ordinary course." (Ex. 2 § 6.2(a).)

30. The UWM Merger Agreement also included a standard "Material Adverse Effect" representation (the "MAE Provision") in which UWM represented that "[s]ince January 1, 2024, through the date of this Agreement, there has not been any Effect that, individually or in the aggregate, has had, or would reasonably be expected to have, a Parent Material Adverse Effect," which was defined (in relevant part) as "any fact, circumstance, occurrence, state of fact, effect, change, event or development (each, an 'Effect') that, individually or in the aggregate, has had, or would reasonably be expected to have, a material adverse effect on the financial condition, business, assets or results of operations of such Person and its Subsidiaries, taken as a whole." (Ex. 2 §§ 1.1, 5.6(a).)

31. The UWM Merger Agreement also included a standard notification covenant (the "Notification Covenant"), which requires UWM to "give prompt notice" to TWO upon, among other things, UWM "obtaining Knowledge of the occurrence or impending occurrence of any event or circumstance relating to it or any of [its] Subsidiaries" that "would reasonably be expected to have, individually or in the aggregate, a . . . Parent Material Adverse Effect." (Ex. 2 § 6.14(c).)

32. The UWM Merger Agreement required UWM to certify, as a condition of closing, that (1) it "performed, or complied with, in all material respects all agreements and covenants

required to be performed or complied with by [UWM] under this Agreement," including the Ordinary-Course Covenant and Notification Covenant (Ex. 2 § 7.3(b)); and (2) certain "representations and warranties," including the MAE Provision, "shall be true and correct in all material respects as of the Closing Date, as though made on and as of the Closing Date" (*id.* § 7.3(a)). Any "breach by [UWM] of any covenant or other agreement contained in this Agreement," including the Ordinary-Course Covenant, Notification Covenant, and MAE Provision, that violated this closing condition and "has not been cured by the earlier of 30 days after the giving of written notice to the breaching party of such breach or inaccuracy and the basis for such notice," is grounds for termination of the UWM Merger Agreement without paying a termination fee. (*Id.* § 8.1(b)(iii).) "[N]o such termination shall relieve any party from liability for any damages . . . for a willful breach of any covenant, agreement or obligation hereunder or intentional fraud," and TWO "shall be entitled to all rights and remedies available at law or in equity." (*Id.* § 8.2(b).)

33. The UWM Merger Agreement also included several key terms concerning potential competing proposals. The Agreement contained a non-solicitation provision that prohibited TWO from soliciting or negotiating a competing merger, acquisition, or similar transaction. (Ex. 2 §§ 1.1, 6.3(a)–(b).) However, TWO could negotiate in response to an unsolicited competing proposal from a third party if "the Company Board or any committee thereof determines in good faith, after consultation with its financial advisors and outside legal counsel, that such Company Competing Proposal is, or could reasonably be expected to lead to, a Company Superior Proposal," which "would, if consummated in accordance with its terms, result in a transaction more favorable to the Company Stockholders than the" merger with UWM. (*Id.* §§ 1.1, 6.3(c), 6.3(d)(ii).) The Agreement required TWO to give UWM notice of any such Company Competing Proposal and

any determination that it was, or could reasonably be expected to lead to, a Company Superior Proposal, and gave UWM three business days to respond. (*Id.* §§ 6.3(c), 6.3(d)(iii).) The Agreement also required TWO to give UWM notice and 24 hours to respond to any modified proposals. (*Id.*)

34. If TWO terminated the UWM Merger Agreement to enter into a Company Superior Proposal—as opposed to terminating for a breach of the Ordinary-Course Covenant, Notification Covenant, or MAE Provision—then the Agreement required TWO to pay UWM a "Company Termination Fee" of $25.4 million. (*Id.* §§ 1.1, 6.3(d)(iii), 8.1(d), 8.3(a).) Upon termination and payment of the Company Termination Fee, the "Agreement shall forthwith become void and there shall be no liability or obligation on the part of any party," except for "a willful breach of any covenant, agreement or obligation hereunder or intentional fraud, or as provided in the Confidentiality Agreement." (*Id.* § 8.2(b).) As demonstrated herein, UWM plainly engaged in willful breach and intentional fraud.

**C. The Proxy Solicitation Process.**

35. On February 12, 2026, TWO filed a definitive proxy statement and prospectus and began mailing it to stockholders of record in connection with a special meeting to vote on the UWM Merger scheduled for March 16, 2026. (Ex. 6.) In the proxy statement, UWM represented that it "believes that the Merger will create sustainable long-term value for its stockholders," including because TWO would deliver "***meaningful expense and revenue synergies***"; "the addition of ***a best-in-class servicing platform which the UWMC Board believes will increase efficiencies***, help lower servicing costs and deliver the best experience possible for UWM's independent mortgage brokers and their borrowers"; and "expand its servicing portfolio and capabilities." (*Id.* at 49–50 (emphasis added).) UWM's representations thus again presented the transaction as a genuine operating combination that would benefit TWO stockholders by achieving

"synergies" and "efficiencies," not merely an acquisition of regularly available MSR assets, which were representative of the market as a whole and held at fair market value.

36. Then UWM's stock price collapsed. During UWM's earnings call on February 25, 2026, when many investors were looking to hear Ishbia's first public comments since the TWO transaction, Ishbia shocked analysts and investors by refusing to take any questions at all. As a result, UWM's stock fell over 9% that day and never materially recovered. As of March 17, 2026, UWM's stock price was down roughly 29% since the announcement of the merger with TWO three months prior. Because the UWM Merger was a stock-for-stock deal in which UWM was buying TWO with UWM stock, UWM's lower stock price made the deal considerably worse for TWO stockholders. Based on UWM's stock price on December 17, 2025, TWO stockholders would have received approximately $11.94 per share. But based on UWM's stock price on March 17, 2026, they would receive only approximately $8.54 per share—nearly ***30% less***, and representing a value significantly less than TWO's book value, or less than TWO stockholders would receive if the company simply liquidated its assets and returned the proceeds.

37. On March 16, 2026, the independent proxy advisory firm ISS recommended that TWO stockholders vote against the merger with UWM. ISS determined that UWM had not provided "a compelling rationale for [the] transaction," which "fails to provide shareholders with a meaningful premium" (indeed, it was a large discount to fundamental value by that time) and would render the TWO shareholders "minority shareholders in a highly controlled company with a concerning corporate governance structure," because: (1) TWO stockholders would experience "a major deterioration in their rights," because the combined company would continue to be controlled by the Ishbia family; (2) TWO would receive only one seat on the Board of the combined company; (3) TWO stockholders were not entitled to appraisal rights in the transaction;

(4) UWM shares had declined in price since the announcement of the merger; and (5) stockholders of the combined company would have no right to call special meetings. (*Id.* at 4–8.) UWM did nothing to address any of these concerns, such as offering to amend the terms of the Merger Agreement or proposing corporate governance reforms.

38. UWM also had "limited engagement with TWO regarding the realization of potential synergies" in operations from the merger, which it had repeatedly represented to both TWO and the market was a basis for the merger.[7] TWO relied on these representations. Achieving synergies was a significant basis for the merger, which required substantial operational planning and coordination well in advance of closing. If TWO had known that UWM was not interested in acquiring RoundPoint and did not intend to realize any synergies or efficiencies from the merger, then TWO never would have entered into the UWM Merger Agreement in the first place.

39. To assist with the stockholder solicitation process, TWO retained D.F. King & Co., Inc. ("D.F. King"), a leading proxy solicitor, to solicit stockholder votes in favor of the UWM Merger Agreement. Despite UWM's falling stock price and the ISS recommendation against the UWM Merger, D.F. King and TWO persistently encouraged TWO stockholders to vote in favor of the UWM Merger. As of the date of the shareholder meeting, TWO had not received enough votes to approve the transaction. UWM therefore asked TWO to adjourn the March 16 meeting to March 24, 2026, and TWO agreed to do so. (Ex. 10. )

40. UWM then took the unusual step of hiring its own proxy solicitation firm, Okapi Partners ("Okapi"), which would necessarily be conflicted in any communications with TWO stockholders because it represented UWM. TWO therefore declined to also retain Okapi or engage with it directly. Instead, TWO continued to work with its non-conflicted proxy solicitor, D.F.

[7] April 20 Proxy at 38.

King, to solicit votes in favor of the merger and instructed D.F. King to work collaboratively with Okapi, including by providing Okapi with access to all relevant information. (Ex. 10 at 2.)

## II. UWM BREACHED THE UWM MERGER AGREEMENT.

41. As discussed above (*see supra* Section I.B), the UWM Merger Agreement contained a standard Ordinary-Course Covenant, MAE Provision, and Notification Covenant. UWM breached the Ordinary-Course Covenant in Q1 2026 when it departed from the ordinary course of business by entering into a $27.5 billion derivative trade betting that interest rates would fall. UWM also breached the MAE Provision because, as interest rates rose instead, this trade resulted in a massive loss that materially hurt UWM's business. Thus, this trade had, and was reasonably expected to have, a material adverse effect on the financial condition, business, assets or results of operations of UWM as evidenced by the massive loss that UWM eventually took and the rescue financing that Oaktree was required to provide. UWM also willfully breached the Notification Covenant by failing to tell TWO about the derivative trade. Had TWO known about UWM's willful breaches, TWO would have terminated the UWM Merger Agreement and would not have been required to pay UWM a termination fee. UWM must therefore repay the $25.4 million termination fee, which it received in connection with termination of the UWM Merger.

42. UWM's longstanding position—since at least 2021—was that "[w]e do not hedge MSRs but manage the economic risk through partially offsetting impact of servicing and mortgaging originations."[8] As Ishbia told analysts in November 2025: "We do not hedge our

[8] UWM Q2 2021 10-Q at 35 (filed May 13, 2021); UWM Q3 2021 10-Q at 38 (filed Nov. 9, 2021); UWM 2021 10-K at 68 (filed Mar. 1, 2022); *see also* UWM Q1 2022 10-Q at 38 (filed May 10, 2022); UWM Q3 2022 10-Q at 42 (filed Nov. 4, 2022); UWM 2022 10-K at 65 (filed Mar. 1, 2023); UWM Q1 2023 10-Q at 38 (filed May 10, 2023); UWM Q2 2023 10-Q at 41 (filed Aug. 9, 2023); UWM Q3 2023 10-Q at 43 (filed Nov. 8, 2023); UWM 2023 10-K at 58 (filed Feb. 28, 2024); UWM Q4 2023 Earnings Call Transcript at 5 (Feb. 28, 2024) (CFO: "unlike some of our competitors, we have not historically specifically hedged the MSR portfolio"); UWM Q3 2024 Earnings Call Transcript at 7–8 (Nov. 7, 2024) (CEO: "we don't really hedge MSRs").

MSRs, as you are hopefully aware."[9] UWM believed that "MSR cash flows provide a natural hedge to originations, as volumes tend to decline in rising interest rate environments and increase in declining interest rate environments."[10] Therefore, as Ishbia represented on an earnings call: "hedging in general in the mortgage industry is expensive. And ***it's something I actually don't believe in***, in general. ***We have never hedged our MSR, I say never. We don't traditionally hedge our MSRs***."[11]

43. So, when UWM was faced with a loss of over $740 million that erased more than one-third of the equity of the company, Ishbia made up a story that claimed that this trade was a "pre-hedge" against the potential risk from lower interest rates if UWM acquired TWO's MSR book. As discussed below (*see infra* Section V.B), that claim is preposterous. Regardless of its veracity, Ishbia admitted—twice—that this trade was "***a one-time event***" and "***a one-time event that won't happen again***," which by definition is outside the ordinary course of business.[12] This is a clear breach of the Ordinary-Course Covenant.

44. UWM's derivative trade also breached the MAE Provision and Notification Covenant. As discussed below (*see infra* Sections V.B–C), as of March 31, 2026, UWM had lost $138.2 million on its derivative trade and had to keep $670 million in cash as margin. UWM ultimately lost over $741 million on the trade and needed distressed, rescue financing from

---

[9] UWM Q3 2025 Earnings Call Transcript, *available at* https://www.investing.com/news/transcripts/earnings-call-transcript-uwm-holdings-q3-2025-reports-mixed-results-stock-drops-93CH-4339195.

[10] UWM 2020 10-K at 16 (filed Mar. 22, 2021); UWM 2021 10-K at 15 (filed Mar. 1, 2022); UWM 2022 10-K at 13 (filed Mar. 1, 2023); *see also* UWM 2023 10-K at 8 (filed Feb. 28, 2024); UWM 2024 10-K at 8, 55 (filed Feb. 26, 2025); UWM Q1 2024 10-Q at 39 (filed May 9, 2024); UWM Q2 2024 10-Q at 42 (filed Aug. 6, 2024); UWM Q3 2024 10-Q at 45 (Nov. 7, 2024); UWM Q1 2025 10-Q at 37 (filed May 6, 2025); UWM 2025 10-K at 10 (filed Feb. 25, 2026).

[11] UWM Holdings Q2 2026 Earnings Call Transcript, *available at* https://www.fool.com/earnings/call-transcripts/2026/08/13/uwm-holdings-uwmc-q2-2026-earnings-call-transcript/ ("UWM Q2 2026 Earnings Call Transcript").

[12] UWM Holdings Q2 2026 Earnings Call Transcript.

Oaktree. This clearly had a "Material Adverse Effect" on UWM, which UWM failed to disclose to TWO, TWO's stockholders, or UWM's stockholders.

45. UWM did not disclose its massive interest-rate gamble until May 11, 2026, when UWM disclosed its Q1 2026 financials.[13] Even then, the disclosure was extremely high-level without any details that would enable TWO or its stockholders (or UWM shareholders) to understand the magnitude of the potential losses or the specifics of the trade itself. Thus, TWO had no way of knowing at that time that UWM breached the Ordinary-Course Covenant, MAE Provision, and Notification Covenant. If TWO had known that UWM breached the Ordinary-Course Covenant, MAE Provision, and Notification Covenant, and that UWM therefore could not satisfy the closing conditions in the UWM Merger Agreement, then TWO would have terminated the UWM Merger Agreement and would not have incurred the obligation to pay UWM a termination fee. (Ex. 2 §§ 7.3(b), 8.1(b)(iii).) To remedy this breach of the UWM Merger Agreement, UWM must repay the $25.4 million termination fee it received.

## III. CCM ACQUIRED TWO

### A. CCM Made An All-Cash Proposal With Secured Financing.

46. On March 17, 2026, after TWO announced that it was postponing its stockholder meeting, CCM reentered the fray with an unsolicited proposal. CCM proposed acquiring 100% of the equity interest in TWO through an all-cash, fully financed offer at a purchase price of $10.70 per share, which would have been a 20% premium to TWO's then-current stock price and a 26% premium to the UWM Merger price as of March 16, 2026, which was just $8.54 per share. CCM also represented that it would "bear any termination fee payable under the UWMC Merger Agreement." The Ad Hoc Committee, in consultation with Jones Day and Houlihan Lokey,

[13] UWM Q1 2026 10-Q at 2.

determined that CCM's all-cash proposal could reasonably be expected to lead to a Company Superior Proposal as defined in the UWM Merger Agreement, and TWO provided the required notice to UWM.[14]

47. On March 20, 2026, CCM fully addressed TWO's prior concerns about its financing by delivering an executed financing commitment letter from a leading national bank that provided a $2 billion secured loan facility to use for the merger, subject only to customary limited conditions. That same day, UWM submitted a revised proposal letter purporting to deliver at least $10.71 per share of value to TWO common stockholders by providing (1) newly issued UWM Class A common stock based on a fixed exchange ratio of 2.3328 modified by "the trailing 10-day volume weighted average price" ("VWAP") of such stock "on the third business day prior to closing"; and (2) if needed, depending on the stock price, additional cash to increase the value to $10.71 per share, "subject to a maximum amount of $2.00 per share."[15]

### B. TWO's Board Executed A Merger Agreement With CCM And Terminated The Merger Agreement With UWM.

48. Later on March 20, 2026, the Ad Hoc Committee met with Jones Day and Houlihan Lokey to consider CCM's and UWM's proposals. The Committee determined that "the actual value of the consideration" in UWM's proposal was "subject to uncertainty," because of the 10-day averaging procedure contained in the calculation of the VWAP, and the fact that the VWAP was calculated "as of the third business day prior to the closing date instead of the closing price" of UWM's stock "on the closing date." This would expose TWO stockholders to significant price risk depending on the realized history of UWM stock price over the 13 days in question. In the days leading up to the latest proposal, UWM's stock "had continued to experience significant

[14] April 20 Proxy at 35.

[15] April 20 Proxy at 35–37.

trading price volatility," and UWM's stock price had declined significantly. If the calculation that UWM had proposed were applied on the day the proposal was received, the value delivered to TWO stockholders would have been substantially less than the headline number UWM purported as being "cash-like." CCM's proposal, by contrast, provided the certainty of $10.70 per share in cash with secured financing. Thus, the Ad Hoc Committee, in consultation with Jones Day and Houlihan Lokey, determined that CCM's proposal constituted a Company Superior Proposal and would result in a more favorable deal for TWO stockholders. On March 21, 2026, TWO's advisors provided notice to UWM, which had an opportunity to make a revised proposal.[16]

49. During this match-right period, TWO and its advisors continued to engage with UWM. TWO and its advisors asked UWM to provide additional information about its financing for the cash portion of its proposal, requested a complete draft of proposed amendments to the UWM Merger Agreement, and had multiple discussions with UWM's management, bankers, and attorneys regarding the merger. UWM provided some of the requested information, but it did not provide evidence of unconditional financing for the full transaction and refused to modify the financial terms of its March 20 proposal.[17] Given what has since come to light about UWM's dire financial straits (*see infra* Section V.A–B), it is unsurprising that UWM was unable to provide financial transparency.

50. On March 24, 2026, CCM increased its all-cash offer to $10.80 per share and TWO again gave notice to UWM. This prompted UWM to modify its offer by increasing the purported value to $10.95 per share and removing the $2.00 per share cash cap, but it did not modify the 2.3328 fixed exchange ratio or the 10-day VWAP calculated three business days before closing, so UWM's March 24 proposal remained subject to the same uncertainties and risks as its March 20

[16] April 20 Proxy at 35–36.
[17] April 20 Proxy at 36.

proposal. Worse, UWM accompanied its proposal with baseless legal threats and a document preservation notice. TWO retained Willkie Farr & Gallagher LLP ("Willkie") as litigation counsel, and Willkie sent a letter to UWM's counsel fully addressing these unfounded allegations. (Ex. 10.)[18]

51. On March 25 and 26, 2026, TWO's full Board met with Jones Day, Willkie, and Houlihan Lokey to consider the CCM and UWM proposals. Houlihan Lokey conducted a financial analysis of both proposals, including "an illustrative analysis of the implied value of the consideration" in UWM's proposal, which demonstrated the uncertainty of UWM's trailing 10-day VWAP in light of its stock price volatility and declines. The analysis showed not just uncertainty but also that, on the day the Ad Hoc Committee met, the value given by UWM's formula was just $10.52 per share, highlighting that there was no real question about which proposal was superior. The CCM proposal, by contrast, provided the certainty of $10.80 per share on an all-cash basis with secured financing. Houlihan Lokey orally issued a fairness opinion (later confirmed in writing), and the Board unanimously determined that entering into a merger agreement with CCM (the "CCM Merger Agreement") was in TWO stockholders' best interests.[19]

52. On March 27, 2026, TWO and CCM executed the CCM Merger Agreement, TWO delivered a notice of termination to UWM, and TWO requested that UWM provide wire instructions to send the $25.4 million termination fee. On March 31, 2026, UWM provided wire instructions and CCM paid the termination fee to UWM.[20]

53. On April 10, 2026, TWO filed with the SEC a preliminary proxy statement for the special meeting of TWO stockholders to approve the CCM Merger. On April 20, 2026, TWO

[18] April 20 Proxy at 36–37.
[19] April 20 Proxy at 9, 37–39.
[20] April 20 Proxy at 39.

filed the definitive proxy statement, began mailing it to stockholders of record, and scheduled the special meeting of TWO stockholders for May 19, 2026. In its April 20, 2026, proxy statement, TWO disclosed that while UWM's final proposal carried a purported headline value of $10.95 per share, that headline figure did not establish actual value or certainty because of, among other things:

> (i) the certainty of value provided by CCM's all-cash consideration compared to the stock-based consideration offered by UWM, which had declined significantly since the announcement of the original UWM Merger Agreement; (ii) the committed financing secured by CCM; (iii) the mechanics and calculation of the cash portion of the total consideration offered by UWM, which would be based on a 10-day volume weighted average price of UWM Class A Common Stock as of the third business day prior to closing (instead of the closing price of UWMC Class A Common Stock on the closing date), and the fact that TWO stockholders would bear the risk of stock price movements between the VWAP measurement date and closing and would further need to sell UWMC shares, which had experienced significant trading price volatility, in the open market to realize cash liquidity, with execution risk as to the price at which such shares could be sold; and (iv) developments since the execution of the original UWMC Merger Agreement that were relevant to its evaluation of UWMC and the prospects for the combined company following the closing.

The Board therefore concluded that the certainty of receiving $10.80 per share in cash at closing from CCM outweighed UWM's final proposal.[21]

## IV. UWM TRIED TO DISRUPT AND PREVENT CCM FROM ACQUIRING TWO.

### A. UWM Engaged In A Highly Inflammatory And Deceptive Media Campaign Against TWO.

54. After TWO entered the CCM Merger Agreement on March 27, 2026, UWM quickly changed its public story. In a press statement that day, UWM said that "[t]he deal for us was a strategy to acquire their servicing book, not their operations, as ultimately there are ***no operational efficiencies to gain***—UWM's operations are best in class," and called TWO a "melting ice cube" while declaring UWM in "growth mode." (Ex. 11 (emphasis added).) That

---

[21] April 20 Proxy at 40.

statement directly contradicted UWM's December 17, 2025 press release and investor presentation, January 30, 2026 Form S-4, February 12, 2026 proxy representations, February 25, 2026 SEC filings, earnings call statements, and presentation, March 11, 2026 investor presentation, and numerous investor meetings and calls at which TWO representatives were also present—and upon which TWO relied—about "meaningful" synergies, increased efficiencies, lower servicing costs, and the benefits of combining the businesses. (*See supra* ¶¶ 26–28.) Thus, UWM's March 27 statements began to expose the gap between what UWM told TWO's management, TWO's Board and the investing public before the vote, and what it told the investing public after the deal collapsed.

55. On April 1, 2026, UWM continued to make false statements in a public statement to the media, claiming that it had "ample access to cash and could have easily completed the transaction with cash," but that there was "no reason for us to try to put forth an all-cash offer." (Ex. 12.) That statement was false when made. In reality, UWM's cash position was deteriorating, it had hundreds of millions of dollars tied up as derivative margin for its speculative bet on interest rates, its balance sheet was already strained, and it never demonstrated that it could fund the full transaction while satisfying its existing obligations. (*See infra* Sections V.A–B.)

56. Despite repeatedly publicly attacking TWO, on April 20, 2026, UWM sent TWO a proposal letter under which TWO stockholders could receive either stock or cash such that (1) each TWO stockholder would receive, by default, 2.3328 shares of UWM Class A common stock for each share of TWO stock held—the same fixed exchange ratio from the terminated UWM Merger Agreement—unless, (2) each TWO stockholder affirmatively elected—on a timely basis and in some future, to-be-determined election process—to receive $11.30 per share in cash. UWM again falsely stated that it could fund the full cash consideration "from its cash on hand and liquidity

sources," and that its proposal was "not subject to any financing conditions." (Ex. 13 at 3.) That statement was false when made for the same reasons that UWM's April 1 statements were false. (*See supra* ¶ 55.) Indeed, the proposal included no financing commitment letter. UWM nevertheless presented the proposal as executable even though its undisclosed derivative exposure, margin requirements, declining cash, and deteriorating leverage left it without the capacity to fund *a genuine all-cash transaction*. UWM also substantially marked up the prior UWM Merger Agreement that UWM itself had negotiated by, among other things, (1) removing employee-matters covenants, such that employees had no protections during the pendency of any merger, which would incentivize them to leave before closing and put at risk the viability of the business during that pendency period; (2) replacing the acceleration of TWO equity awards for those employees who were not terminated (which UWM had negotiated in the first place when the default would have been to replace these with UWM stock) with UWM stock awards at the original 2.3328 ratio, which would have been at 86% of the value of the awards and was not allowable under the company's contracts and policies at the valuations that UWM was proposing; and (3) requiring TWO, upon termination, to pay a termination fee and reimburse UWM for an uncapped amount of out-of-pocket expenses incurred since November 2025.[22]

57. On April 23, 2026, TWO sent UWM a letter containing detailed questions regarding UWM's April 20 proposal. UWM responded on April 24 by reaffirming its "March 11 materials" that "described the cost synergies available upon a combination—approximately $150 million annualized—inclusive of servicing platform integration, financing efficiencies, and operational overlap." That reaffirmance is directly contradicted by UWM's March 27 statement. UWM also represented that "UWMC believes that it would be in a position to obtain these

[22] April 20 Proxy at 40–41; Two Harbors Investment Corp., Proxy Supplement at 12–13 (May 4, 2026) (the "May 4 Proxy Supplement").

regulatory approvals" from state regulators needed to operate a combined company "within 60 days of signing of a new merger agreement." As discussed below (*see infra* Section V.A), that statement regarding regulatory approvals was materially false when made. UWM acknowledged that its proposed changes to "Employee Matters" could result in significant "employee attrition between signing and closing." UWM also acknowledged that it was replacing "acceleration" for TWO executives with "equity awards" in UWM to "avoid a meaningful cash compensation expense" to UWM, which, again, was not permitted under the contract. UWM's response did not disclose any "hedge" or UWM's derivative trading position.

58. UWM's April 24 letter also appended a purported $1.2 billion financing commitment letter from Mizuho Bank, Ltd. ("Mizuho") and represented that this financing was committed and sufficient for the TWO transaction. The letter, however, contained a due-diligence condition allowing Mizuho to terminate the financing in its sole discretion if it was not satisfied with legal, business, or financial diligence. Thus, Mizuho provided only a conditional lender interest, not a reliable, committed source of financing.[23]

59. Despite the significant issues with UWM's proposal and UWM's public statements that called into question its commitment to closing any transaction with TWO, TWO's Board evaluated the competing unsolicited proposals in good faith, which required considerable time and expense from TWO and its advisors. Notably, TWO's financial advisor, Houlihan Lokey, informed the company that it would be unable to provide a fairness opinion for any transaction that had a more than 25% difference in valuation between the default stock and the elective cash consideration at deal inception. This was disclosed in TWO's proxy materials and was well known to UWM. After UWM's proposal, UWM's stock continued to decline, hitting new low prices

[23] May 4 Proxy Supplement at 2.

daily, while the value of TWO's asset portfolio remained relatively constant throughout this period. In the days after UWM's proposal, the process proceeded as follows:

- **April 28, 2026:** CCM raised its all-cash proposal from $10.80 per share to $11.30 per share. CCM also increased the termination fee from $25.4 million to $50 million and required UWM to reimburse CCM for the prior termination fee if UWM entered into an agreement constituting a Company Superior Proposal.[24] UWM's stock price closed at $3.74.

- **April 30, 2026:** UWM raised its cash election to $12 per share—while keeping the same UWM stock exchange ratio as the default consideration—and its Mizuho commitment to $1.3 billion. UWM publicly represented that its financing was "sufficient to pay all of the cash consideration, even if 100% of the TWO stockholders elected cash." (Ex. 14.) But the same due-diligence condition remained in the financing package, and UWM still had not shown that its cash, credit lines, and margin capacity could fund the full transaction. These statements were therefore misleading for the same reason as the April 1 statement: UWM was selling an image of cash certainty that its balance sheet did not support.[25] UWM's stock price closed at $3.54.

- **May 4, 2026:** UWM obtained financing without the lender-due-diligence condition.[26] UWM's stock price closed at $3.54.

- **May 6–8, 2026:** CCM raised its all-cash proposal to $12 per share.[27] UWM's stock price closed at $3.38.

- **May 11, 2026:** UWM proposed a $12.50 cash election—while keeping the same UWM stock exchange ratio as the default consideration—and claimed that it could close within approximately two months of signing. In its proposal and open letter to TWO stockholders, UWM vaguely invoked "strong relationships with national regulators," licensure in all 50 states, and its prior work, but did not provide any details about obtaining regulatory approvals for closing. UWM also declared that "[a]bsent further sabotage by the TWO Board or management, we intend to close a transaction within approximately 2 months of signing an agreement." (Ex. 15.) This statement was false when made because UWM could not fund the full cash component of its proposal and had no regulatory path to close within two months. (*See infra* Section V.A.) UWM's stock price closed at $3.33.

[24] Two Harbors Investment Corp., Current Report at 1 (Apr. 29, 2026) (the "April 29 Current Report"); May 4 Proxy Supplement at 28.

[25] May 4 Proxy Supplement at 11–12, 15.

[26] Two Harbors Investment Corp., Proxy Supplement at 6 (May 11, 2026) (the "May 11 Proxy Supplement").

[27] May 11 Proxy Supplement at 6–7.

- **May 13, 2026:** CCM added a pro-rated cash dividend for the quarter in which the acquisition closes, which could provide up to an additional $0.34 per share. The combined value of the $12 per share merger consideration plus the pro-rata dividend would total $12.11 if the deal closed on July 31, or $12.22 if the deal closed on August 31.[28] UWM's stock price closed at $3.10.

60. TWO and its advisors engaged with UWM's proposals in good faith throughout this process. At every step, the Ad Hoc Committee carefully analyzed every proposal in consultation with Jones Day, Willkie, and Houlihan Lokey to assess whether it was in TWO stockholders' best interests. In fact, the Ad Hoc Committee and the full Board met repeatedly during this period, including on April 27, April 28, May 1, and May 3, 2026. Each time the Ad Hoc Committee and the Board considered UWM's proposals, Houlihan Lokey highlighted that it would be unable to provide a fairness opinion because of the huge difference in valuation at inception between the default-stock consideration and the voluntary-cash election.[29]

### B. UWM Waged A Misleading Proxy Campaign Against The CCM-TWO Transaction.

61. From May to June 2026, TWO and its proxy solicitor, D.F. King, worked to solicit stockholder votes in favor of the acquisition by CCM. At the same time, UWM tried to solicit votes against the acquisition of TWO by CCM by continuing its highly inflammatory public relations campaign in the media, in "open letters" to TWO stockholders, and in proxy filings urging TWO's stockholders to vote against the acquisition by CCM. Throughout this process, UWM tried to distract from the substantive deficiencies of its proposals by resorting to name-calling, falsehoods, and litigation threats, which caused reputational harm to TWO and forced TWO and its advisors to respond to UWM's unfounded attacks.

---

[28] Two Harbors Investment Corp., Proxy Supplement (June 15, 2026) (the "June 15 Proxy Supplement"); Two Harbors Investment Corp., Proxy Supplement (June 18, 2026) (the "June 18 Proxy Supplement").

[29] May 4 Proxy Supplement at 9–13.

62. For example, UWM and Ishbia repeatedly accused "Company Management and the Board" of "acting in their own self-interest to the detriment of the TWO stockholders" by supporting the CCM acquisition so "that they have jobs and sustainability." (Ex. 16.)[30] This was demonstrably false: TWO had publicly represented in proxy filings that "no member of the TWO Board is expected to continue with the combined company, and no offers of employment have been made to, nor have any discussions taken place regarding employment of, any TWO named executive officer—whether in a deal with CCM or UWMC." (Ex. 17.) In fact, all of TWO's named executive officers have been terminated by CCM, and no member of TWO's Board has any role at CCM.

63. UWM and Ishbia also claimed that TWO preferred CCM's deal because it provided "accelerated management compensation packages" in a "management-enriching deal," while UWM "reduces overall compensation to management and defers some of the pay out." (Exs. 17, 19–20.) This was again false: TWO executives would receive accelerated payments under their contracts if they were terminated whether in a transaction with CCM or UWM. These agreements were put in place four years before the UWM Merger Agreement and fully disclosed to UWM in December 2025 as part of the UWM Agreement.[31] So UWM was well aware that if it fired the TWO executive team—and Ishbia had already said that he valued the management at zero and had no need for them—then the TWO executives would also receive accelerated payments under their contracts. Further, such *management* compensation had no bearing on TWO's *independent directors* on the Ad Hoc Committee who oversaw the transaction process, and were advised by independent legal and financial advisors.

---

[30] May 13, 2026 Proxy Supplement at 17.

[31] May 11, 2026 Proxy Supplement at 15–17.

64. Ishbia also falsely accused TWO of soliciting CCM's March 17 bid, claiming—without any evidence—that TWO "went out and tried to get another bid" and engaged in "outreach to a third party," which is "against the law." (Exs. 18, 21.) Neither UWM nor Ishbia have ever provided any support for these baseless accusations because there is none. Rather, as TWO explained in its proxy filings, "[o]n March 17, 2026, CCM submitted an ***unsolicited*** proposal letter to TWO to acquire 100% of the equity interests in TWO."[32] Importantly, that was *after* TWO announced that it was postponing its shareholder meeting, so CCM did not disrupt the original vote.

65. At every step of its proxy campaign, UWM publicly and falsely accused TWO of refusing to engage. For example:

- **May 6, 2026 Earnings Call:** Ishbia claimed that "[t]hey never engaged" with UWM's proposals, and suggested that he would have offered more money "[i]f they would have engaged with us." (Ex. 16.)
- **May 11, 2026 "Open Letter":** TWO's "Board could have engaged with UWMC to determine if more value could be realized for TWO stockholders or if modifications could have been made to our offer to address their concerns. . . . Why won't the TWO Board engage?" (Ex. 15.)
- **May 14, 2026 Public Statement:** "[T]he TWO Board can only maximize value by truly engaging with UWMC." UWM was "disappointed that TWO's Board continues to refuse to engage with UWMC," and "UWMC welcomes the opportunity to engage directly with the TWO Board and their advisors to address any and all supposed concerns they have with UWMC's proposal and to continue negotiating for the benefit of TWO shareholders." (Ex. 18.)

[32] April 20 Proxy at 34 (emphasis added). Because CCM was RoundPoint's largest subservicing client, there had been contact between TWO and CCM's operational personnel during the non-solicitation period unrelated to any merger.

- **May 18, 2026 Public Statement:** The "TWO Board has refused to engage constructively with UWMC and has failed to conduct a value-maximizing process for stockholders. . . . The TWO Board has conducted a pattern of bad-faith dealing, refusing to engage with UWMC even after repeated improvements to UWMC's proposals. . . . UWMC is eager to engage directly with the TWO Board and their advisors to address any concerns they have with the terms of UWMC's proposal and stands ready to work quickly to negotiate and consummate an agreement that achieves the best value for TWO stockholders." (Ex. 20.)

66. As UWM well knew, those statements were misleading and did not tell the full story. In reality, TWO and its advisors engaged extensively with every single UWM proposal. The Ad Hoc Committee and/or full Board met repeatedly with their legal and financial advisors to evaluate each of UWM's proposals, including on April 22, April 27, April 28, May 1, and May 3, 2026. Despite UWM's intensifying public attacks, TWO's advisors sent UWM clarifying questions, requested additional information about UWM's financing, solicited draft amendments to the Merger Agreement, and analyzed each successive proposal on its merits. (*See supra* ¶¶ 57–60.) TWO fully disclosed all of this in public proxy filings.[33]

67. Under the CCM Merger Agreement, TWO was subject to a non-solicitation covenant and therefore could not more fully engage with UWM directly unless it determined, in consultation with its advisors, that one of UWM's proposals constituted a "Company Superior Proposal."[34] None did. In particular, among many other deficiencies, every one of UWM's proposals made its own rapidly declining stock the default consideration. As UWM's stock price fell, the gap between the cash-election price and the default stock consideration widened. For example, under UWM's May 11 proposal, UWM advertised a cash-election price of $12.50, but the default stock consideration was worth only $7.58 based on UWM's then-current stock price—a 65% differential. Because TWO and its advisors had no way of knowing precisely what

[33] May 4 Proxy Supplement at 8–18; April 20 Proxy at 35–41.

[34] May 4 Proxy Supplement at 9–12; May 11 Proxy Supplement at 6–7.

percentage of shareholders would actually affirmatively elect to receive cash, Houlihan Lokey was unable to provide a fairness opinion on any of UWM's post-termination proposals. (Ex. 17.)

68. UWM was well aware of the non-solicitation covenant in the CCM Merger Agreement—it was identical to the provision in the UWM Merger Agreement—so UWM's repeated public statements that TWO's Board refused to engage were highly misleading. TWO's Board fully engaged with UWM's proposal in compliance with its obligations under the CCM Merger Agreement by reviewing and analyzing UWM's proposals with its advisors, and publicly disclosing its analysis in proxy filings. TWO's Board could not engage UWM directly unless UWM made a Company Superior Proposal—such as an all-cash, fully financed offer (which it never made), instead of a default-stock, cash-elective proposal—or CCM agreed to waive the non-solicitation covenant.

69. On May 13, 2026, a TWO stockholder filed a lawsuit in Maryland federal court echoing UWM and Ishbia's public accusations. The lawsuit alleged that TWO violated Section 14(a) of the Securities Exchange Act of 1934 and SEC Rule 14a–9 because its proxy statements did not adopt UWM and Ishbia's narrative and sought a temporary restraining order ("TRO") or preliminary injunction preventing, or at least delaying, a stockholder vote on the CCM Merger.[35] TWO denies those allegations. On information and belief, UWM, Ishbia, and/or their counsel coordinated with the counsel that filed this lawsuit.

70. On May 18, 2026, this Court held a hearing and denied the motion for a TRO or preliminary injunction. (Ex. 21.) This Court rejected Ishbia's accusations of solicitation and management conflicts as "conjecture," held that the plaintiff's remaining complaints were "immaterial" in light of TWO's extensive disclosures, and concluded that "I don't find any

[35] Compl., *Assad v. Two Harbors Inv. Corp., et al.*, No. 1:26-cv-01896-JRR (May 13, 2026), ECF No. 1.

material omission or misstatement in TWO's Schedule 14(a) materials." (*Id*. at 99:10–11; *see also* *id*. at 100:8–9, 101:15–17.)

### C. TWO Obtained A Waiver So It Could Engage Directly With UWM But UWM Failed To Submit Any Proposal.

71. As discussed above (*see supra* ¶ 67), TWO could not engage with UWM under the terms of the CCM Merger Agreement unless UWM made a Company Superior Proposal (which it never did) or CCM agreed to waive the non-solicitation covenant. After months of UWM claiming that the only impediment to a merger was TWO's alleged failure to engage, the Ad Hoc Committee decided to put UWM's claims to the test and requested a waiver from CCM in order to engage directly with UWM.[36] As further described below, CCM granted the waiver and TWO representatives engaged directly, ***but UWM never submitted any additional proposal***, which directly contradicts UWM's prior statements.

72. On June 6, 2026, after consulting its advisors, the Ad Hoc Committee requested that CCM provide TWO with a limited waiver of the non-solicitation provision of the CCM Merger Agreement. CCM granted TWO's request for a waiver permitting TWO to engage in direct discussions with UWM through June 12, 2026 at 11:59 p.m. E.D.T.[37]

73. On June 8, 2026, at approximately 7:00 a.m. E.D.T., Greenberg invited Ishbia to come to New York at any time during the waiver period for a principals-only meeting with him and Kasnet. Greenberg stated that TWO's Board would consider in good faith any proposal delivering all-cash consideration to all stockholders, consistent with its fiduciary obligations and without committing to approve any proposal. Ishbia responded that he would "love to engage and

[36] June 15 Proxy Supplement at 4.
[37] June 15 Proxy Supplement at 4.

see if there is a deal that works," and was "excited to engage . . . and see if this can work for your team and ours."[38] But Ishbia did not do so.

74. Although TWO emphasized that time was of the essence and offered to meet beginning June 9, Ishbia refused to travel to New York and scheduled a videoconference with Greenberg and Kasnet for 3:00 p.m. on June 11—the next-to-last day of the waiver period. UWM thus squandered most of the limited waiver period it had insisted on obtaining. Ishbia's own refusal to engage for almost the entire waiver period is flatly inconsistent with UWM's claims that it was prepared to proceed with a merger with TWO or even make a proposal, and that the only impediment was TWO's purported refusal to engage. UWM certainly was not acting like a counterparty that wanted to do a deal or find a solution, which would jump at such an opportunity and, at a minimum, submit a proposal.

75. During the June 11 videoconference, Greenberg and Kasnet repeatedly asked Ishbia to put a specific proposal in writing. Ishbia refused to do so. Instead, Ishbia floated possible changes—including making cash the default, modifying the election for some stockholders, or changing the exchange ratio—and falsely represented that UWM could close a transaction within 90 days. Ishbia acknowledged during the call that "no one smart is going to pick UWM stock at the price it's at right now." At various points during the call, rather than provide terms or financing evidence, Ishbia accused Greenberg and Kasnet of engaging in "self-dealing" and being "focused on [their] own paycheck." TWO rejected those attacks and continued to invite UWM to submit a proposal.[39] In fact, Greenberg and Kasnet not only invited Ishbia to submit an all-cash proposal, though they stated that was the Board's preference, but also encouraged Ishbia to submit any revised proposal at all that solved the impediments of past proposals.

[38] June 15 Proxy Supplement at 5.

[39] June 15 Proxy Supplement at 6.

76. Later on June 11, Ishbia sent an email to Greenberg and Kasnet falsely stating that "UWM is ready and able to acquire TWO," and claiming that "UWM is able to adjust our terms." He called TWO's concerns about whether UWM could fund an all-cash deal "ridiculous" and "a complete joke," stating that "Mizuho has provided a line, UWM has existing lines, and if needed I personally could fund the whole deal myself." (Ex. 22.) The email did not contain any offer or proposal, transaction terms, financing commitment for the full cash consideration, or evidence of Ishbia's claimed personal funding. Nor did Ishbia disclose the existence, let alone the size, of the derivative loss on his books that had crystallized a month earlier.

77. TWO responded by pointing out that Ishbia's email was not a proposal, identified the deficiencies UWM needed to cure, offered to provide any specifically requested information, and again invited UWM to submit any proposal for Board consideration. TWO specifically sought an actionable all-cash structure, reliable evidence of financing, and terms that the Board could evaluate before the waiver period expired. (Ex. 22.) And while TWO made its preference for an all-cash deal clear, Greenberg and Kasnet invited Ishbia to propose whatever other deal he would like that solved TWO's concerns. TWO thus gave UWM a clear opportunity to substantiate its claims, but UWM failed to do so.

78. On June 12—the last day of the waiver period—TWO's legal and financial advisors contacted UWM's counsel, executives, financial advisor, and proposed lender to determine whether a revised proposal, financing documentation, or definitive agreements would be forthcoming. None was. Ishbia instead sent another combative email denying the reality of the waiver period, attacking TWO's directors, and insisting that TWO first deem UWM's existing proposal potentially superior before he would engage in further discussions. (Ex. 22.)

79. When the waiver period expired, UWM had not yet submitted to TWO any new proposal, revised proposal, committed financing for the full cash transaction, definitive transaction documents, specific diligence requests, or requests for additional time. On information and belief, Ishbia and UWM's bluster and insistence on engaging were lies designed to create the appearance of a transaction with TWO that UWM did not have the ability to close in order to distract from its deteriorating financial condition and an attempt to justify UWM's interest-rate-derivative betting masquerading as a hedge to market participants who might not be fluent in MSR hedging details. None of this was disclosed to TWO or the TWO stockholders who were closely watching every word uttered by UWM in deciding whether to vote for the CCM Merger.

## V. UWM DEFRAUDED TWO AND THE INVESTING PUBLIC.

### A. UWM Did Not Have The Practical Ability To Close A Merger With TWO.

80. For months, UWM insisted that it wanted to enter into a merger with TWO, and TWO was clear about what UWM needed to do: make an all-cash offer with secured financing, a way to close, and a path for regulatory approval. UWM never did so. In fact, UWM never even made an all-cash offer. Instead, UWM always offered its own stock—which dropped ***over 50%*** from the date of the UWM Merger Agreement to the end of the waiver period—as the default consideration, while giving TWO stockholders the *option* to affirmatively elect to receive cash. This was no accident. UWM never made an all-cash offer because, upon information and belief, its liquidity position and its balance sheet were deteriorating so fast that it did not have the cash or financing to do so. All of UWM's offers were premised on the notion that many TWO stockholders would not understand the proposal or would not be paying attention, and therefore would not affirmatively elect cash, and UWM might be able to acquire TWO's assets by using its own rapidly declining stock. On information and belief, and now that the truth has emerged, it appears that UWM was not capable of closing any merger with TWO; it simply wanted to keep

the fiction of a merger with TWO alive to use as cover for its multi-billion-dollar interest-rate derivative bet. (*See infra* Section V.B.)

81. ***First***, UWM never gave TWO a straight answer about how it would finance any all-cash merger with TWO. CCM ultimately paid approximately $1.26 billion to acquire TWO, which was backed by financing commitments from a leading national bank. UWM and Ishbia, by contrast, pointed to ever-changing letters from Mizuho (nearly all of which provided only conditional financing), insisted that UWM had sufficient cash on hand to fund the merger, and even claimed that Ishbia could personally fund the transaction. But UWM never provided any details in writing to support these assertions, such as a written commitment for unconditional, immediately available funds to acquire TWO with cash, despite repeated requests from TWO and its advisors to do so. On information and belief, UWM did not provide such documentation because it did not have the ability to finance a transaction of this size given its poor financial and liquidity condition, which is why UWM never made an all-cash offer for TWO.

82. UWM's finances continued to deteriorate from March to June: Fitch downgraded UWM's outlook twice in six months; UWM's cash and cash equivalents declined from $503 million at year-end 2025 to $425 million as of March 31, 2026; UWM's leverage ratio reached 3.2x, which its own board described as an all-time high; and Bloomberg estimates showed that UWM's one-year probability of default doubled in roughly three weeks. (Ex. 17.) Thus, UWM was a highly leveraged company approaching financial collapse, which was inconsistent with UWM's representations to TWO and all investors that it could finance a merger.

83. ***Second***, UWM made public statements and revisions to the Merger Agreement that would damage operations during the pendency of any merger and which could have made it impossible to close the transaction. UWM and Ishbia publicly and repeatedly disavowed any

interest in TWO's operations (*see supra* ¶¶ 54–55), so it was unclear how the combined company would operate or how it would achieve any efficiencies for TWO stockholders. UWM also removed covenants protecting employees during the pendency of the merger, which the Board feared would lead to a mass exodus of employees and severe pre-closing business-continuity risks.[40] UWM never addressed any of these concerns, despite repeated requests from TWO and its advisors to do so. To the contrary, UWM admitted that its changes to the "employee matters covenants" risked significant "employee attrition between signing and closing" resulting in "attrition-driven operating impact" on TWO. On information and belief, UWM made these statements and contract revisions because it did not intend to close any merger with TWO and viewed the disruptions and uncertainty caused within TWO to be desirable payback.

84. ***Third***, UWM did not provide any pathway to streamlined regulatory approval for a merger with TWO. To close a merger with TWO, UWM would have needed to obtain change-of-control approvals from various state and federal regulators for TWO's mortgage-servicing licenses. UWM insisted that it could close in two months from signing a merger agreement, an unrealistic and unfounded expedited closing timeline supported by no explanation or details of how UWM would be able to obtain the regulatory approvals a combined company would need to operate. On information and belief, UWM did not provide details or a plan for doing so because it did not intend to close any merger with TWO.

**B. UWM Made A Massive, Failed Derivative Bet And Its Finances Collapsed.**

85. While UWM was purporting to seek a merger with TWO, it took a massive, ***$27.5 billion*** derivative trading position—more than 10 times larger than UWM's entire market capitalization—betting that interest rates would fall. UWM bet wrong and it ***lost over***

[40] May 4 Proxy Supplement at 7.

***$741 million***. There was no valid reason for UWM to take this position. On information and belief, UWM took a speculative bet on interest rates, and it cooked up the fiction of a potential merger with TWO to justify this bet to the market as a purported hedge for acquiring TWO's MSR portfolio. That was a lie.

86. For starters, TWO ***had already hedged*** its MSR portfolio—which UWM was already aware of—and UWM would have acquired those hedges in any merger. Because TWO already had a hedging position in place, it faced only approximately a 1.3% common-book-value decrease per 25-basis-point rate change, so there was no need for massive, additional positions.[41] To put that in perspective, that is roughly a $14 million loss for a 25-basis-point change in rates. Interest rates moved around 35 basis points, so that should have translated to about $20 million. But UWM lost over $741 million. This number is even more astonishing if scaled against TWO's book value, which was the purported hedge. On this basis, the hedge loss of $741 million would have been a loss of approximately 70% of the entire value of the company. Even if TWO were not hedged (which it was), UWM's position was still approximately ***13 times*** TWO's MSR interest-rate exposure. And all of TWO's risk measures were publicly disclosed, so this is not a matter of conjecture. Anyone trained in the mechanics of hedging knows that UWM's derivative position was a one-directional, speculative bet that interest rates would fall, not a "hedge."

87. UWM also kept its derivatives trade on long after TWO terminated the UWM Merger Agreement. UWM accepted the termination fee on March 31, 2026. As of March 31, UWM's derivative position had a fair-value liability of approximately $288 million and had produced an approximately $138.2 million first-quarter loss.[42] UWM also had to keep

[41] Exhibit 99.2 to Two Harbors Investment Corp., Form 8-K at 9, 17 (Apr. 28, 2026) ("Q1 2026 Investor Presentation").

[42] UWM Q1 2026 10-Q at 2, 19.

$670 million in cash as margin—more than 40% of its equity value.[43] Even if this position were really a "pre-hedge" for TWO's MSR portfolio—which makes no sense because it was an order of magnitude too large—then UWM should have taken it off after termination because it no longer had any need to hedge, was facing mounting losses, and had to keep a substantial amount of cash as margin. Instead, UWM continued to add to the position after the UWM Merger Agreement was terminated, kept the derivative trade on for months, and continued to maintain the appearance of seeking to merge with TWO. (*See supra* Sections IV.B–C.) UWM lost another approximately $603.2 million on its derivative positions in the second quarter, and thus ultimately ***lost over $741 million*** in total.[44]

88. On August 5, 2026, UWM reported a net loss of approximately $451.9 million for Q2 2026, which UWM attributed to the approximately $603.2 million of second-quarter derivative losses.[45] On the August 6, 2026 earnings call, Ishbia claimed that UWM had been "over-hedged" in anticipation of the (nonexistent) TWO transaction and characterized the loss as transaction-specific that did not reflect the strength of UWM's core business.[46] That was a lie. UWM's Q2 2026 financials showed that its equity had fallen from approximately $1.6 billion to $985.3 million year over year—a 43.6% drop—and its non-funding debt-to-equity ratio was 6.13x.[47] In other words, UWM was a highly leveraged company in dire financial straits whose equity value was plummeting. Unsurprisingly, UWM's stock dropped nearly 35% on August 6, and stockholders are suing UWM, UWM's board of directors, and Ishbia for securities fraud and

[43] UWM Q1 2026 10-Q at 8; UWM Holdings Corp., Annual Report at 67 (Feb. 2026) ("UWM 2025 10-K").
[44] UWM Q2 2026 10-Q at 35.
[45] UWM Q1 2026 10-Q at 2.
[46] UWM Q2 2026 Earnings Call Transcript.
[47] UWM Q2 10-Q at 2, 4 (filed Aug. 7, 2026).

breaching their fiduciary duties.[48] Fitch also downgraded UWM's credit rating to "junk" and Moody's put UWM on credit watch negative.

**C. UWM Obtained Distressed Financing From Oaktree.**

89. At the same time that UWM announced its disastrous derivatives loss and second-quarter financials, UWM also announced a "strategic capital partnership" with Oaktree. In reality, this was distressed, rescue financing because UWM was teetering on the brink of bankruptcy and desperately needed capital, which Oaktree used to extract highly favorable terms and to begin taking control of the company away from the Ishbia family. Ishbia, as the controlling stockholder, was on both sides of this transaction by acquiring at least $150 million of preferred stock on extremely favorable terms, while the UWM common stockholders will no longer be paid a dividend and are now junior to up to $2.05 billion of senior equity held by Oaktree and Ishbia.

90. Oaktree is an investment firm that targets companies experiencing financial distress and specializes in rescue financing.[49] On August 5, 2026, the same day that UWM announced its second-quarter earnings, UWM also announced "a $2.05 billion strategic capital partnership with the Ishbia Family via their new family investment vehicle, SFS Group Capital, LLC ('SFS') and Oaktree Capital Management, L.P." Under this agreement, Oaktree provided $1.5 billion of financing in return for "preferred equity together with warrants," SFS provided $150 million, and UWM planned a rights offering of up to $400 million backstopped by "the Ishbia Family and Oaktree, if needed." "A representative from Oaktree will join the UWM Board of Directors, and

[48] Compl., *Bond v. UWM Holdings Corp., et al.*, No. 26-cv-12862 (E.D. Mich. Aug. 13, 2026), ECF No. 1; Compl., *Farzad v. Ishbia, et al.*, No. 2:26-cv-13113-BRM-APP (E.D. Mich. Aug. 31, 2026), ECF No. 1; Compl., *Paytas v. Ishbia, et al.*, No. 2:26-cv-13151-RJW-DRG (E.D. Mich. Sep. 1, 2026), ECF No. 1.

[49] James Crombie, *Oaktree Sees Rescue Financing as Opportunity of the Decade*, Bloomberg (Nov. 21, 2024), https://www.bloomberg.com/news/articles/2024-11-21/oaktree-sees-rescue-financing-as-opportunity-of-the-decade.

Oaktree will additionally have the right to nominate one additional independent director." And "UWM will suspend its quarterly dividend."[50]

91. This is a very favorable deal for Oaktree that guaranteed substantial returns for the investment in preferred stock of UWM (including an effective interest rate of at least 20% per year comprised of 10% in-kind interest disguised as a redemption premium that accrues each year into perpetuity and an additional 10% per year interest (if paid in cash) or an additional 13% interest (if paid in kind), limited the Ishbia family's control, and took away the Ishbia family's ability to continue to siphon hundreds of millions of dollars out of the Company but allowed Ishbia's family to acquire preferred stock with similar terms to the Oaktree preferred stock and therefore to continue receiving preferred dividends. As *The Wall Street Journal* reported: "To do the deal, Ishbia had to give up some control over his company. In exchange for its $1.5 billion infusion, Oaktree gets the right to veto changes to the company's C-suite and corporate bylaws and to force UWM to buy out its stake after seven years. It also gets two seats on the board, warrants for additional shares and ***at least $600 million in guaranteed return***." And "[t]he Oaktree deal puts much tighter strings on what UWM can distribute to its majority owner," taking away the Ishbia family's main avenue for siphoning dividends from UWM. "If UWM fails to pay Oaktree its hundreds of millions of dollars in dividends when due, Oaktree gets a majority of board seats, ***effectively taking over the company***, and would be paid out in full before other shareholders on any potential sale."[51]

---

[50] *UWM Holdings Corporation Announces $2.05 Billion Strategic Capital Partnership with the Ishbia Family and Oaktree* (Aug. 5, 2026), https://investors.uwm.com/news/financial-news/news-details/2026/UWM-Holdings-Corporation-Announces-2-05-Billion-Strategic-Capital-Partnership-with-the-Ishbia-Family-and-Oaktree/default.aspx.

[51] Ben Glickman, *America's Mortgage King Lost $600 Million and Needed a Rescue*, Wall St. J. (Aug. 11, 2026), *available at* https://www.wsj.com/finance/americas-mortgage-king-lost-600-million-and-needed-a-rescue-ab39465f.

92. The terms of the Oaktree deal confirm that UWM was desperate and needed a massive infusion of capital to stay afloat. On information and belief, Oaktree conducted due diligence of UWM's financials, and the one-sided terms of the deal reflect Oaktree's determination that UWM was in dire financial straits and was therefore a highly motivated seller. This, too, directly contradicts UWM and Ishbia's repeated representations that they could finance and close a merger with TWO.

93. Ishbia also claimed that "Oaktree has so much better partnership for us than Two Harbors or anything else would have been."[52] That is flatly inconsistent with UWM's affirmative lawsuit in this case that it suffered damages from not buying TWO.

## VI. TWO'S RELIANCE AND DAMAGES.

94. TWO was harmed by incurring an obligation to pay UWM a $25.4 million termination fee. As discussed above (*see supra* Section II), UWM willfully breached the Ordinary-Course Covenant by putting on a $27.5 billion interest-rate-derivative trade, which Ishbia admitted was a "one-time event" outside the ordinary course of business. UWM also willfully breached the MAE Provision because the trade resulted in a massive loss that materially affected UWM's business such that it needed distressed, rescue financing. UWM also breached the Notification Covenant by failing to promptly notify TWO about the interest-rate trade, which had an MAE on UWM's business. If TWO had known about UWM's breaches of the Ordinary-Course Covenant, MAE Provision, and Notification Covenant, then it would have terminated the UWM Merger Agreement without incurring the obligation to pay the termination fee.

95. TWO reasonably relied on UWM's repeated representations that it sought to acquire RoundPoint and sought to achieve $150 million of synergies by combining the companies'

---

[52] UWM Q2 2026 Earnings Call Transcript.

operations, and UWM's repeated representations about its financing, transaction readiness, intent to close a merger with TWO, and willingness to submit an actionable proposal. Indeed, TWO conducted detailed diligence regarding the proposed synergies, and TWO's Board recommended that TWO stockholders vote in favor of the UWM Merger because of "[t]he expectation that the combined company will be able to realize meaningful cost and revenue synergies." (Ex. 5 at 48; Ex. 6 at 50.) Had UWM truthfully disclosed that it was not interested in acquiring TWO's operations, did not intend to achieve any synergies, did not intend to close a merger with TWO, and lacked the financial capacity to do so, then TWO would not have transacted or negotiated with UWM. This harmed TWO by, at minimum, requiring it to incur an obligation to pay UWM a $25.4 million termination fee.

96. TWO's recoverable losses include any and all business or reputational harms incurred as a result of UWM's conduct.

## COUNT I
## BREACH OF CONTRACT

97. TWO incorporates the preceding paragraphs as if fully set forth herein.

98. Section 5.6(a) of the UWM Merger Agreement required UWM to represent that there was an "Absence of Certain Changes or Events," including that "[s]ince January 1, 2024, through the date of this Agreement, there has not been any Effect that, individually or in the aggregate, has had, or would reasonably be expected to have, a Parent Material Adverse Effect." Section 1.1 defines a "Material Adverse Effect," in relevant part, as "any fact, circumstance, occurrence, state of fact, effect, change, event or development (each, an 'Effect') that, individually or in the aggregate, has had, or would reasonably be expected to have, a material adverse effect on the financial condition, business, assets or results of operations of such Person and its Subsidiaries, taken as a whole."

99. Section 6.2(a) of the UWM Merger Agreement required, in relevant part, that UWM "use commercially reasonable efforts to [] conduct its businesses in all material respects in the ordinary course" from signing to closing "[p]ending the Merger."

100. Section 6.14(c) of the UWM Merger Agreement required, in relevant part, that UWM "give prompt notice" to TWO upon, among other things, UWM "obtaining Knowledge of the occurrence or impending occurrence of any event or circumstance relating to it or any of [its] Subsidiaries" that "would reasonably be expected to have, individually or in the aggregate, a . . . Parent Material Adverse Effect."

101. Section 7.3(a) of the UWM Merger Agreement required that, as a closing condition, UWM certify that certain "representations and warranties" in the Agreement, including "Section 5.6(a) (Absence of Certain Changes or Events)[,] . . . shall be true and correct in all material respects as of the Closing Date, as though made on and as of the Closing Date."

102. Section 7.3(b) of the UWM Merger Agreement required that, as a closing condition, UWM certify that it "performed, or complied with, in all material respects all agreements and covenants required to be performed or complied with by [UWM] under this Agreement at or prior to the Effective Time."

103. Section 8.1(b)(iii) of the UWM Merger Agreement provided that "[t]his Agreement may be terminated and the Merger and the other Transactions contemplated hereby may be abandoned at any time prior to the Effective Time":

> in the event of a breach by the other party of any covenant or other agreement contained in this Agreement or if any representation and warranty of the other party contained in this Agreement fails to be true and correct which (A) would give rise to the failure of a condition set forth in Section 7.2(a) or 7.2(b) or Section 7.3(a) or 7.3(b), as applicable, if it was continuing as of the Closing Date and (B) cannot be or has not been cured by the earlier of 30 days after the giving of written notice to the breaching party of such breach or inaccuracy and the basis for such notice, and the date of the proposed termination (a "Terminable Breach") . . . .

104. Section 8.2(b) of the UWM Merger Agreement provided that:

> In the event of termination of this Agreement by any party . . . , this Agreement shall forthwith become void and there shall be no liability or obligation on the part of any party except with respect to this Section 8.2, Section 6.6(b), Section 8.3 and Article I and Article IX; provided, however, that notwithstanding anything to the contrary herein, no such termination shall relieve any party from liability for any damages (including, in the case of the Company, damages based on the consideration that would have otherwise been payable to the Company Stockholders, which shall be deemed to be damages of the Company) for a willful breach of any covenant, agreement or obligation hereunder or intentional fraud, or as provided in the Confidentiality Agreement, in which case the aggrieved party shall be entitled to all rights and remedies available at law or in equity.

105. Section 8.3 of the UWM Merger Agreement required TWO to incur the obligation to pay UWM a $25.4 million Termination Fee if TWO terminated the Agreement "pursuant to Section 8.1(d) (*Company Superior Proposal*)," or, in certain circumstances, "pursuant to Section 8.1(b)(iv) (*Failure to Obtain Company Stockholder Approval*)." It did not require TWO to pay UWM a Termination Fee if TWO terminated the Agreement pursuant to Section 8.1(b)(iii).

106. Read together, Sections 5.6(a), 6.2(a), 6.14(c), 7.3(a), 7.3(b), 8.1(b)(iii), 8.2(b), and 8.3 provided that (1) UWM covenanted to use commercially reasonable efforts to conduct its businesses in all material respects in the ordinary course from signing to closing; (2) UWM represented the absence of material adverse effects from January 2024 to closing; (3) UWM covenanted to promptly notify TWO of any material adverse effects; (4) it was a condition to closing that UWM certify it was in compliance with the Ordinary-Course Covenant, MAE Provision, and Notification Covenant; and (5) if UWM failed to do so, then TWO could terminate the UWM Merger Agreement without incurring the obligation to pay UWM a Termination Fee.

107. UWM willfully breached the Ordinary-Course Covenant between signing and closing. On May 11, 2026, UWM disclosed that, during the first quarter of 2026, UWM put on a $27.5 billion interest-rate-derivative trade that was outside the ordinary course of business. Ishbia

admitted that this trade was "a one-time event that won't happen again," which was outside the ordinary course of business.

108. UWM willfully breached the MAE Provision and Notification Covenant between signing and closing. During that time period, UWM put on a $27.5 billion interest-rate-derivative trade that had a material adverse effect on UWM's finances and business because the trade ultimately resulted in a $741 million total loss, required UWM to keep $670 million of cash as derivative margin, and forced UWM to obtain distressed, rescue financing. But UWM never notified TWO about the interest-rate trade.

109. Because UWM breached the Ordinary-Course Covenant, MAE Provision, and Notification Covenant, it could not have satisfied the closing conditions in Sections 7.3(a) or 7.3(b) of the UWM Merger Agreement. TWO therefore could have terminated the UWM Merger Agreement without incurring the obligation to pay UWM a Termination Fee. Because UWM did not disclose its $27.5 billion derivative position and accompanying loss until May 11, 2026, TWO had no way of knowing that UWM was in breach of the Ordinary-Course Covenant, MAE Provision, and Notification Covenant before it terminated the UWM Merger Agreement on March 27, 2026.

110. On March 31, 2026, UWM received a $25.4 million Termination Fee related to termination of the UWM Merger Agreement. If TWO had known that UWM had breached the Ordinary-Course Covenant, MAE Provision, and Notification Covenant, it would have terminated the UWM Merger Agreement pursuant to Section 8.1(b)(iii) and would not have incurred any obligation to pay UWM a Termination Fee. Thus, TWO has suffered damages of at least $25.4 million from UWM's breaches.

**COUNT II**
**FRAUD**

111. TWO incorporates the preceding paragraphs as if fully set forth herein.

112. UWM, acting through Ishbia and other authorized representatives, made material misrepresentations to TWO and in public communications intended to mislead TWO regarding UWM's ability and intent to acquire RoundPoint, merge TWO and UWM's operations, achieve synergies and efficiencies, and fund and complete a merger with TWO; UWM's availability of specific financing sources; and UWM's operational and regulatory path to closing. UWM also omitted the existence of an MAE on its finances and business from its undisclosed interest-rate trade. TWO reasonably relied on UWM's representations, which caused TWO to suffer harm.

113. On December 2, 2025, during an in-person dinner in Detroit, Michigan, Ishbia represented to Greenberg and Kasnet that UWM wanted to acquire RoundPoint, and they discussed various opportunities to achieve significant synergies.

114. Ishbia's December 2, 2025 statements were intentionally false and/or materially misleading when made because UWM did not intend to (1) acquire RoundPoint, (2) combine TWO and UWM's operations, or (3) achieve any synergies or efficiencies. As UWM later admitted, "[t]he deal for us was a strategy to acquire their servicing book, not their operations."

115. On December 17, 2025, UWM issued a press release representing that "[t]his transaction is expected to provide UWM with (i) ***expanded servicing expertise*** and scale as it continues to expeditiously bring servicing in-house, (ii) a high-quality $176 billion UPB MSR portfolio, nearly doubling its existing MSR portfolio to approximately $400 billion, which will create significant recurring revenues, and (iii) ***the opportunity for approximately $150 million of cost and revenue synergies*** on an annual basis to help drive meaningful earnings accretion" (emphasis added). UWM also represented that it "[e]xpect[s] further efficiencies around

financing, hedging and secondary markets from TWO's proven capital markets expertise and UWM's scale," and the "[o]pportunity for ***meaningful cost and revenue synergies***" (emphasis added).

116. Also on December 17, 2025, UWM gave an investor presentation representing that the "Combination of leading Origination and Servicing franchises" and the "accelerate[d] transition of servicing in-house" provided "a highly compelling and strategic transaction." UWM specifically highlighted TWO's "servicing portfolio" and "RoundPoint Overview" in its "TWO Harbors Overview." UWM also represented that the transaction would create the "[o]pportunity for ***meaningful expense and revenue synergies***," result in "***synergies from this transaction***," create a "top 8 servicer," accelerate "UWM's transition of servicing in-house," and benefit from "TWO's high-quality servicing portfolio and servicing operation." UWM also represented that the transaction would result in "***approximately $150mm in annual potential synergies***," including cost savings from operating expenses, servicing, and financing, and revenue synergies.

117. UWM's December 17, 2025 statements were intentionally false and/or materially misleading when made because UWM did not intend to (1) acquire and combine TWO and UWM's operations, or (2) achieve any synergies or efficiencies. As UWM later admitted, "[t]he deal for us was a strategy to acquire their servicing book, not their operations."

118. On January 30, 2026, TWO filed a registration statement on Form S-4 with the SEC in which UWM represented that "UWMC believes that there are ***significant benefits and synergies*** that may be realized through leveraging the processes and scale of UWMC and Two Harbors," by seeking to "integrate the operations and business of Two Harbors into its existing business in an efficient and timely manner, to combine systems and management controls and to integrate relationships with industry contacts and business partners." UWM listed as "UWMC's Reasons

for the Merger" that merging with TWO "provides the opportunity to realize ***meaningful cost and revenue synergies***."

119. UWM's January 30, 2026 statements were intentionally false and/or materially misleading when made because UWM did not intend to (1) acquire and combine TWO and UWM's operations, or (2) achieve any synergies or efficiencies. As UWM later admitted, "[t]he deal for us was a strategy to acquire their servicing book, not their operations."

120. On February 12, 2026, TWO filed a definitive proxy statement with the SEC in which UWM represented that it "believes that the Merger will create sustainable long-term value for its stockholders," including because TWO would deliver "***meaningful expense and revenue synergies***"; "the addition of ***a best-in-class servicing platform which the UWMC Board believes will increase efficiencies***, help lower servicing costs and deliver the best experience possible for UWM's independent mortgage brokers and their borrowers"; and "expand its servicing portfolio and capabilities."

121. UWM's February 12, 2026 statements were intentionally false and/or materially misleading when made because UWM did not intend to (1) acquire and combine TWO and UWM's operations, or (2) achieve any synergies or efficiencies. As UWM later admitted, "[t]he deal for us was a strategy to acquire their servicing book, not their operations."

122. On February 25, 2026, UWM filed its annual report for fiscal year 2025 on Form 10-K with the SEC in which UWM represented: "We believe that there are ***significant benefits and synergies*** that may be realized through leveraging the processes and scale of UWMC and Two Harbors" by seeking "to integrate the operations and business of Two Harbors into our existing business in an efficient and timely manner, to combine systems and management controls and to integrate relationships with industry contacts and business partners."

123. Also on February 25, 2026, during UWM's earnings call, Ishbia described "the pending Two Harbors acquisition and process of bringing servicing in-house" to create "a closed-loop platform that will help position us to accelerate broker channel growth and drive consumer retention for us and the channel." UWM's CFO similarly referred to "bringing servicing in-house and completing the Two Harbors acquisition to further strengthen our business for long-term growth and success." In the accompanying presentation, which UWM publicly filed on Form 8-K with the SEC on February 27, 2026, UWM identified "***$150mm annual potential synergies***" from the planned merger with TWO with improved "In-House Servicing."

124. UWM's February 25, 2026 statements were intentionally false and/or materially misleading when made because UWM did not intend to (1) acquire and combine TWO and UWM's operations, or (2) achieve any synergies or efficiencies. As UWM later admitted, "[t]he deal for us was a strategy to acquire their servicing book, not their operations."

125. On March 11, 2026, UWM made an investor presentation to TWO stockholders, which was publicly filed on Form 8-K with the SEC, in which UWM represented to TWO stockholders that it expected "[a]dditional value from ***~$150M of cost synergies*** expected to be realized," and "UWM's #1 origination capabilities complement TWO's servicing platform and servicing portfolio."

126. UWM's March 11, 2026 statements were intentionally false and/or materially misleading when made because UWM did not intend to (1) acquire and combine TWO and UWM's operations, or (2) achieve any synergies or efficiencies. As UWM later admitted, "[t]he deal for us was a strategy to acquire their servicing book, not their operations."

127. On April 1, 2026, UWM made a public statement reported in media outlets claiming that UWM had "ample access to cash and could have easily completed the transaction with cash," but that there was "no reason for us to try to put forth an all-cash offer."

128. UWM's April 1, 2026 statement was false or materially misleading when made because (1) UWM's cash position was deteriorating, approximately $670 million of cash was tied up as derivative margin, its balance sheet was strained, and it had not demonstrated the ability to fund the full transaction while satisfying its existing obligations; and (2) UWM omitted the existence of an MAE on its finances and business from its undisclosed interest-rate trade.

129. On April 20, 2026, UWM sent TWO a proposal letter stating that it could fund the full cash consideration of a merger "from its cash on hand and liquidity sources," and that its proposal was "not subject to any financing conditions." The proposal did not include any financing commitment letter.

130. UWM's April 20, 2026 statements were false or materially misleading when made because (1) UWM's cash position was deteriorating, approximately $670 million of cash was tied up as derivative margin, its balance sheet was strained, and it had not demonstrated the ability to fund the full transaction while satisfying its existing obligations; (2) UWM did not have the ability or intent to close a merger transaction with TWO; and (3) UWM omitted the existence of an MAE on its finances and business from its undisclosed interest-rate trade.

131. On April 24, 2026, UWM sent TWO a letter reaffirming its "March 11 materials" that "described the cost synergies available upon a combination – approximately $150 million annualized – inclusive of servicing platform integration, financing efficiencies, and operational overlap." UWM also represented that "UWMC believes that it would be in a position to obtain these regulatory approvals" from state regulators needed to operate a combined company "within

60 days of signing of a new merger agreement." UWM further represented that Mizuho had provided a $1.2 billion financing commitment sufficient for a merger with TWO.

132. UWM's April 24, 2026 statements were false or materially misleading when made because (1) UWM (a) did not intend to acquire and combine TWO and UWM's operations, (b) did not intend to achieve any synergies or efficiencies, and (c) had admitted, on March 27, 2026, that "[t]he deal for us was a strategy to acquire their servicing book, not their operations"; (2) UWM did not have the ability to obtain regulatory approvals needed to close within two months; (3) the financing letter from Mizuho contained a due-diligence condition allowing Mizuho to terminate in its sole discretion if it was not satisfied with legal, business, or financial diligence, so UWM falsely presented a conditional lender interest as reliable, committed financing; and (4) UWM omitted disclosing any "hedging" transactions or its $27.5 billion derivative trading position, which had an MAE on UWM's finances and business.

133. On April 30, 2026, UWM sent TWO a proposal letter representing that it had sufficient access to cash "ensuring adequate proceeds."

134. Also on April 30, 2026, UWM issued an "open letter to the stockholders of Two Harbors Investment Corp." representing that its merger proposal was "supported by a committed unsecured $1.2 billion bridge facility from Mizuho Bank, Ltd." UWM also represented that "our financing is certain," "has no financing conditions," and "our offers are supported by a committed, unsecured bridge facility from Mizuho Bank, Ltd. which is sufficient to pay all of the cash consideration, even if 100% of the TWO stockholders elected cash." UWM further represented that "[w]e remain prepared to execute promptly and to deliver this transaction on the timeline our prior work permits."

135. UWM's April 30, 2026 statements were false or materially misleading when made because (1) UWM's cash position was deteriorating, approximately $670 million of cash was tied up as derivative margin, its balance sheet was strained, and it had not demonstrated the ability to fund the full transaction while satisfying its existing obligations; (2) the financing letter from Mizuho contained a due-diligence condition allowing Mizuho to terminate in its sole discretion if it was not satisfied with legal, business, or financial diligence, so UWM falsely presented a conditional lender interest as reliable, committed financing; (3) UWM did not have the ability or intent to close a merger transaction with TWO; and (4) UWM omitted the existence of an MAE on its finances and business from its undisclosed interest-rate trade.

136. On May 6, 2026, during UWM's Q1 2026 earnings call, Ishbia stated that TWO's "team members are very good, but their leadership team—we were not as impressed with. ***They went out and tried to get another bid***, and they did. Whether it was appropriate or not, we can discuss that at a later point. If they would have engaged with us, ***we always planned on paying $12***." Ishbia also stated:

> Quite honestly, based on when the stock price went down, ***I would rather pay it in cash than in stock***. I feel like I am giving my stock away at a really low price. They never engaged—they just went out to another offer. We made another offer; they basically ignored it. We made another one and said, okay, ***we will go to $12—what we originally planned on paying***. I think it was maybe $11.95, but you can do the math based on when the stock was at $5.11 or $5.15 the day we cut the deal, I think.

Ishbia further stated that TWO's "board and their management team do not have any value to us. Now they are trying to do anything they can to potentially engage with someone else so that they have jobs and sustainability. It will play out." And Ishbia stated that "***[w]hether they take cash or stock does not matter to me***. We feel really good about that. For the shareholders of Two Harbors, they obviously would prefer taking $12 in cash or UWM Holdings Corporation shares than taking $11.30 in cash. That is obviously going to play out that way."

137. UWM's May 6, 2026 statements were false or materially misleading when made because (1) UWM's cash position was deteriorating, approximately $670 million of cash was tied up as derivative margin, its balance sheet was strained, and it had not demonstrated the ability to fund the full transaction while satisfying its existing obligations; (2) UWM did not have the ability or intent to close a merger transaction with TWO; (3) CCM's bid was unsolicited; (4) no member of TWO's Board was expected to continue after CCM's acquisition of TWO, and CCM did not make any offers of employment or conduct any discussions regarding employment of any TWO executive officers (and has subsequently terminated the entire executive management team); (5) TWO analyzed and considered UWM's proposals and responded directly to UWM's letters; and (6) UWM omitted the existence of an MAE on its finances and business from its interest-rate trade.

138. On May 11, 2026, UWM sent TWO a proposal letter representing that it had the ability to finance an offer for TWO of $12.50 per share in cash, and that it intended to close the merger in approximately two months after signing an agreement. UWM also issued an "open letter to the stockholders of Two Harbors Investment Corp." representing it was "increas[ing] the cash consideration to $12.50 per share" such that ***"$12.50 in cash is available for all stockholders*** if they choose – it is not subject to cap or proration." UWM further represented that "[w]e have an expeditious path to completion," and "***we intend to close a transaction within approximately 2 months*** of signing an agreement, given our strong relationships with national regulators, licensure in good standing in all 50 states, and work in support of our prior agreement to acquire TWO." UWM also claimed that TWO's Board refused to engage with UWM, which it "assume[d] it has something to do with protecting a deal structure that ensures immediate cash payouts for Two Harbors management in the range of $35 million on the date of close."

139. UWM's May 11, 2026 statements were false or materially misleading when made because (1) UWM's cash position was deteriorating, approximately $670 million of cash was tied up as derivative margin, its balance sheet was strained, and it had not demonstrated the ability to fund the full transaction while satisfying its existing obligations; (2) UWM did not have the ability or intent to close a merger transaction with TWO; (3) UWM did not have the ability to obtain regulatory approvals needed to close within two months; (4) UWM conflates TWO's Board, which had a majority (seven out of eight directors) of independent members and was negotiating the transaction, with TWO's management; (5) UWM omits that any payments to TWO's management upon termination were determined by TWO's Board's Compensation Committee, with advice from independent compensation consultants, *in 2021*, long before any of these merger discussions took place and were contractual obligations of the company no matter who the acquirer was; (6) TWO analyzed and considered UWM's proposals and responded directly to UWM's letters; and (7) UWM omitted the existence of an MAE on its finances and business from its interest-rate trade.

140. On May 14, 2026, UWM issued a public statement claiming that its "offer is still superior" to CCM's, and that "the TWO Board can only maximize value by truly engaging with UWMC." UWM also stated that it was "disappointed that TWO's Board continues to refuse to engage with UWMC," and "UWMC welcomes the opportunity to engage directly with the TWO Board and their advisors to address any and all supposed concerns they have with UWMC's proposal and to continue negotiating for the benefit of TWO shareholders."

141. UWM's May 14, 2026 statements were false or materially misleading when made because (1) UWM did not have the ability or intent to close a merger transaction with TWO; (2) TWO analyzed and considered UWM's proposals and responded directly to UWM's letters;

and (3) UWM omitted the existence of an MAE on its finances and business from its interest-rate trade.

142. On May 15, 2026, UWM made public statements through "Ishbia[] speaking directly to reporters." Ishbia accused TWO of "outreach to a third [that] crossed a legal line," stating that "'That's against the law, what they did.'" Ishbia also stated that UWM's "competing offer cost CrossCountry more than expected."

143. UWM's May 15, 2026 statements were false or materially misleading when made because (1) UWM did not have the ability or intent to close a merger transaction with TWO; (2) CCM's bid was unsolicited; and (3) UWM omitted the existence of an MAE on its finances and business from its interest-rate trade.

144. On May 18, 2026, UWM issued a public statement that the "TWO Board has refused to engage constructively with UWMC and has failed to conduct a value-maximizing process for stockholders." UWM also stated that:

- ***UWMC has strong financing supported by a committed, unsecured bridge facility from Mizuho that is not subject to any financing condition***, ratings triggers, collateral pools, borrowing-base tests, advance rate mechanics, or market-conditioned funding contingency. Mizuho also removed customary due diligence conditions that TWO questioned. ***UWMC is further supported by significant cash on its balance sheet and additional sources of liquidity. Stockholders can verify UWMC's strong position by reviewing its publicly filed financials, which provide transparency and certainty*** not provided by CCM.

- ***There is an expeditious path to completion with UWMC, given our strong relationships with national regulators, licensure in good standing in all 50 states, and work in support of our prior agreement to acquire TWO***. . . . ***We intend to close a transaction within approximately 2 months of signing an agreement.***

- ***The TWO Board has conducted a pattern of bad-faith dealing, refusing to engage with UWMC*** even after repeated improvements to UWMC's proposals. As a result of its intransigence, the TWO Board has only achieved the minimum value possible for its stockholders. . . .

- The CCM transaction features golden parachutes in the range of $35 million as a reward for Two Harbors management – not stockholders – and may be the only real motivation for refusing to engage around superior proposals from UWMC. . . .

- ***UWMC is eager to engage directly with the TWO Board and their advisors to address any concerns they have with the terms of UWMC's proposal and stands ready to work quickly to negotiate and consummate an agreement that achieves the best value for TWO stockholders***.

145. UWM's May 18, 2026 statements were false or materially misleading when made because (1) UWM's cash position was deteriorating, approximately $670 million of cash was tied up as derivative margin, its balance sheet was strained, and it had not demonstrated the ability to fund the full transaction while satisfying its existing obligations; (2) UWM did not have the ability or intent to close a merger transaction with TWO; (3) UWM did not have the ability to obtain regulatory approvals needed to close within two months; (4) UWM conflates TWO's Board, which had a majority (seven out of eight directors) of independent members and was negotiating the transaction, with TWO's management; (5) UWM omits that any payments to TWO's management upon termination were determined by TWO's Board's Compensation Committee, with advice from independent compensation consultants, *in 2021*, long before any of these merger discussions took place and were contractual obligations of the company; (6) TWO analyzed and considered UWM's proposals and responded directly to UWM's letters; and (7) UWM omitted the existence of an MAE on its finances and business from its interest-rate trade, whose impact on UWM was known to Ishbia by this time.

146. On June 8, 2026, Ishbia responded to Greenberg's email inviting him to meet for a principals-only meeting during the waiver period by saying that he would "love to engage and see if there is a deal that works" and was "excited to engage . . . and see if this can work for your team and ours."

147. Ishbia's June 8, 2026 statements were false or materially misleading when made because (1) UWM did not have the ability or intent to close a merger transaction with TWO; (2) UWM's interest-rate derivative loss crystallized on or about May 19, 2026, but was not disclosed; and (3) UWM omitted the existence of an MAE on its finances and business from its interest-rate trade.

148. On June 11, 2026, during a videoconference, Ishbia represented to Greenberg and Kasnet that UWM would make a revised proposal to TWO, which could include making cash the default consideration, modifying the stock election, and changing the exchange ratio. Ishbia also represented that UWM could close a merger transaction within 90 days.

149. Later on June 11, 2026, Ishbia emailed TWO that "UWM is ready and able to acquire TWO," that "UWM is able to adjust our terms," and that "Mizuho has provided a line, UWM has existing lines, and if needed I personally could fund the whole deal myself." UWM did not make any written proposals during the waiver period, which expired 11:59 PM ET on June 12, 2026.

150. Ishbia's June 11, 2026 statements were false or materially misleading when made because (1) UWM's cash position was deteriorating, approximately $670 million of cash was tied up as derivative margin, its balance sheet was strained, and it had not demonstrated the ability to fund the full transaction while satisfying its existing obligations; (2) UWM did not have the ability or intent to close a merger transaction with TWO; (3) UWM did not have the ability to obtain regulatory approvals needed to close within 90 days; (4) UWM's interest-rate derivative loss crystallized on or about May 19, 2026, but was not disclosed; and (5) UWM omitted the existence of an MAE on its finances and business from its interest-rate trade.

151. UWM knew that its representations were false or acted with reckless disregard for their truth because:

a. Ishbia, as UWM CEO, President, and Chairman, and whose family controlled a majority of UWM's equity and voting rights, was aware of UWM's intentions regarding TWO's operations, synergies, and efficiencies, and was aware of UWM's cash position, derivative positions, balance sheet, and finances;

b. UWM repeatedly touted the expected $150 million in synergies and efficiencies, which was widely reported in the financial press;

c. UWM publicly admitted "[t]he deal for us was a strategy to acquire their servicing book, not their operations," which directly contradicts its prior statements and business history in which it had never before bought MSRs but instead had been the largest seller of MSRs in the market;

d. UWM gave Oaktree highly favorable terms for financing because UWM was in dire financial straits and desperate for capital;

e. UWM repeatedly demanded that TWO engage with it directly, but when TWO did, UWM did not respond until the next-to-last-day and failed to provide any offers or proposals; and

f. UWM is highly experienced regarding MSRs and related regulatory requirements, and was therefore aware that change-of-control approvals cannot be obtained in 60 or 90 days.

152. On information and belief, UWM did not intend to close any merger with TWO; it simply wanted to keep the fiction of a merger with TWO alive to use as an excuse to justify its failed interest-rate derivative bet to the market as a purported hedge for acquiring TWO's MSR

portfolio. UWM's statements were therefore calculated to convince the market that it was continuing to pursue a merger with TWO, keep TWO engaged through the waiver period, delay the CCM stockholder vote, and make UWM falsely appear ready to close while concealing the truth.

153. TWO actually and reasonably relied on UWM's statements that it sought to acquire RoundPoint and sought to achieve $150 million of synergies by combining the companies' operations, and UWM's repeated representations about its financing, transaction readiness, intent to close a merger with TWO, and willingness to submit an actionable proposal. TWO conducted detailed diligence regarding the proposed synergies, and TWO's Board recommended that TWO stockholders vote in favor of the UWM Merger because of "[t]he expectation that the combined company will be able to realize meaningful cost and revenue synergies." If TWO had known the truth that UWM was not interested in acquiring TWO's operations, did not intend to achieve any synergies, did not intend to close a merger with TWO, and lacked the financial capacity to do so, then TWO would not have transacted or negotiated with UWM.

154. UWM's fraud proximately caused TWO actual and reliance damages in an amount to be proven at trial. As a result of UWM's misrepresentations, TWO incurred an obligation to pay a $25.4 million Termination Fee when TWO terminated the UWM Merger Agreement. TWO also suffered reputational harm from UWM's public false attacks. Thus, TWO suffered damages of at least $25.4 million from UWM's fraudulent conduct.

155. UWM's conduct also warrants punitive damages because it was knowing, intentional, and undertaken with actual knowledge of falsity or reckless indifference.

## COUNT III
## NEGLIGENT MISREPRESENTATION

156. TWO incorporates the preceding paragraphs as if fully set forth herein.

157. UWM owed TWO a duty to exercise reasonable care in communicating material information, including regarding UWM's ability and intent to acquire RoundPoint, merge TWO and UWM's operations, achieve synergies and efficiencies, and fund and complete a merger with TWO; the availability of UWM's specific financing sources; UWM's operational and regulatory path to closing; and the existence of an MAE on UWM's finances and business from its undisclosed interest-rate trade.

158. UWM negligently supplied false or misleading information to TWO in connection with a potential merger transaction in its December 2, 2025, December 17, 2025, January 30, 2026, February 12, 2026, February 25, 2026, March 11, 2026, April 1, 2026, April 20, 2026, April 24, 2026, April 30, 2026, May 6, 2026, May 11, 2026, May 14, 2026, May 15, 2026, May 18, 2026, June 8, 2026, and June 11, 2026 statements identified above. (*See supra* ¶¶ 112–50.) In these statements, UWM failed to exercise reasonable care in truthfully and accurately communicating its ability and intent to acquire RoundPoint, combine TWO and UWM's operations, achieve $150 million in synergies or efficiencies, fund and complete a merger with TWO; UWM's availability of specific financing sources; UWM's operational and regulatory path to closing; and the existence of an MAE on UWM's finances and business from its undisclosed interest-rate trade.

159. UWM knew or should have known that TWO would likely act on these statements. UWM's statements were calculated to induce TWO to transact or negotiate with UWM.

160. TWO justifiably relied on UWM's statements that it sought to acquire RoundPoint and sought to achieve $150 million of synergies by combining the companies' operations, and UWM's repeated representations about its financing, transaction readiness, intent to close a merger with TWO, and willingness to submit an actionable proposal. TWO conducted detailed diligence regarding the proposed synergies, and TWO's Board recommended that TWO stockholders vote

in favor of the UWM Merger because of "[t]he expectation that the combined company will be able to realize meaningful cost and revenue synergies." If TWO had known the truth that UWM was not interested in acquiring TWO's operations, did not intend to achieve any synergies, did not intend to close a merger with TWO, and lacked the financial capacity to do so, then TWO would not have transacted or negotiated with UWM.

161. UWM's negligence proximately caused TWO actual and reliance damages in an amount to be proven at trial. As a result of UWM's misrepresentations, TWO incurred an obligation to pay a $25.4 million Termination Fee when TWO terminated the UWM Merger Agreement.

## PRAYER FOR RELIEF

WHEREFORE, TWO respectfully requests that the Court enter judgment in its favor and award:

A. $25.4 million Termination Fee;

B. Disgorgement of $25.4 million Termination Fee;

C. actual, compensatory, and reliance damages in an amount to be determined at trial;

D. punitive damages;

E. prejudgment and post-judgment interest;

F. costs and attorneys' fees to the extent recoverable by contract, statute, rule, or other law; and

G. such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

TWO demands a trial by jury on all issues so triable.

**ANSWER TO PLAINTIFFS' COMPLAINT**

Defendant and Counterclaimant TWO Harbors Investment Corp. ("TWO"), by and through its undersigned counsel, respectfully submits the following Answer to the Complaint, filed by Plaintiff and Counterclaim Defendant UWM Holdings Corp. ("UWMC") and Plaintiff UWM Acquisitions 1 LLC (together with UWMC, "UWM"), dated August 10, 2026 (the "Complaint"). To the extent the paragraphs in the Complaint are grouped under headings and subheadings, TWO responds generally that the headings and subheadings do not constitute factual averments, and thus the headings are not included herein. To the extent a response is deemed necessary, TWO denies each and every heading and subheading in the Complaint. Further, except as explicitly admitted herein, TWO denies each and every allegation, including, without limitation, any allegation in the headings, subheadings, footnotes, and/or the prayer for relief.

TWO's responses are based on information available to TWO at this time. TWO reserves the right to revise, amend, or supplement any or all of the matters contained in this Answer as additional facts are ascertained, analyses are made, research is completed, and additional documents are discovered, whether through discovery, ongoing investigation, or any other means.

1. Paragraph 1 contains UWM's characterizations and/or legal conclusions to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 1, except admits that UWM and TWO entered into a definitive merger agreement on December 17, 2025 (the "UWM Merger Agreement").

2. Paragraph 2 contains UWM's characterizations to which no response is required. To the extent a response is required, TWO lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 2, and otherwise denies the allegations in Paragraph 2.

3. Paragraph 3 contains UWM's characterizations to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 3, except admits that (1) TWO settled litigation with Pine River Capital Management Advisers LLC and related entities (collectively, "Pine River") in 2025 for a one-time cash payment of $375 million without admitting wrongdoing; and (2) TWO had a portfolio of mortgage servicing rights ("MSRs").

4. Paragraph 4 contains UWM's characterizations and/or legal conclusions to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 4, except admits that UWM and TWO executed the UWM Merger Agreement on December 17, 2025.

5. Paragraph 5 contains UWM's characterizations and/or legal conclusions to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 5, except admits that (1) William Greenberg was TWO's CEO and Rebecca Sandberg was TWO's Chief Legal Officer; (2) TWO retained proxy solicitor D.F. King & Co., Inc. ("D.F. King"); (3) UWM retained proxy solicitor Okapi Partners LLC ("Okapi"); (4) on March 17, 2026, CCM[53] made an unsolicited, all-cash offer to acquire TWO, and an ad hoc committee of TWO's Board of Directors (the "Ad Hoc Committee") made a determination in good faith and in consultation with its legal and financial advisors that CCM's offer could reasonably be expected to lead to a "Company Superior Proposal" as defined in Section 6.3 of the UWM Merger Agreement; (5) on March 24, 2026, UWM made a proposal purporting to deliver at least $10.95 per share of value to TWO common stockholders by providing (a) newly issued UWMC Class A common stock based on a fixed exchange ratio of 2.3328 modified by "the trailing 10-day volume

[53] "CCM" includes CrossCountry Mortgage, LLC, CrossCountry Intermediate Holdco, LLC, and CrossCountry Holdco, LLC.

weighted average price" ("VWAP") of such stock "on the third business day prior to closing," and (b) if needed, depending on the stock price, additional cash to increase the value to $10.95 per share; and (6) on March 27, 2026, TWO terminated the UWM Merger Agreement, cancelled the upcoming stockholder meeting, and accepted CCM's operative proposal, because TWO's Board of Directors (the "Board") determined in good faith and in consultation with its legal and financial advisors that CCM's proposal was a "Company Superior Proposal" as defined in Section 6.3 of the UWM Merger Agreement. TWO respectfully refers this Court to Rebecca Sandberg's March 7, 2026 email for a complete and accurate description of its contents.

6. Paragraph 6 contains UWM's characterizations and/or legal conclusions to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 6.

7. TWO lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 7, except admits that UWMC is a Delaware corporation, headquartered in Michigan, whose shares trade on the New York Stock Exchange.

8. TWO lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 8.

9. Admitted.

10. Paragraph 10 states legal conclusions to which no response is required.

11. Paragraph 11 states legal conclusions to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 11, except admits that it entered into the UWM Merger Agreement, and respectfully refers this Court to the UWM Merger Agreement for a complete and accurate description of its terms.

12. Paragraph 12 states legal conclusions to which no response is required.

13. Admitted.

14. Paragraph 14 contains UWM's characterizations to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 14, except admits that (1) management of TWO and UWM have interacted, and (2) TWO has acquired MSRs from UWM.

15. Denied.

16. Paragraph 16 contains UWM's characterizations and/or legal conclusions to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 16, except admits that (1) UWM submitted non-binding proposals to acquire TWO in December 2024 and January 2025; (2) UWM and TWO did not enter into a merger agreement in December 2024 or January 2025.

17. Denied, except TWO admits that it settled a lawsuit brought by Pine River in 2025 for a one-time cash payment of $375 million without admitting wrongdoing.

18. Paragraph 18 contains UWM's characterizations to which no response is required. To the extent a response is required, TWO (1) lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 18 regarding whether UWM conducted "extensive due diligence" or engaged in "extensive discussions"; (2) admits that TWO's Board formed an Ad Hoc Committee; (3) respectfully refers this Court to TWO's definitive proxy statement filed with the Securities and Exchange Commission ("SEC") on February 12, 2026 for a complete and accurate description of this process, and (4) otherwise denies the allegations in Paragraph 18.

19. Paragraph 19 contains UWM's characterizations to which no response is required. To the extent a response is required, TWO respectfully refers this Court to TWO's definitive proxy

statement filed with the SEC on February 12, 2026 for a complete and accurate description of the transaction process, including the submission of proposals, and otherwise denies the allegations in Paragraph 19.

20. Paragraph 20 contains UWM's characterizations to which no response is required. To the extent a response is required, TWO admits that, on December 17, 2025, TWO and UWM executed the UWM Merger Agreement, and respectfully refers this Court to TWO's definitive proxy statement filed with the SEC on February 12, 2026 for a complete and accurate description of TWO's Board's determinations with respect to competing proposals, and otherwise denies the allegations in Paragraph 20.

21. Paragraph 21 contains UWM's characterizations to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 21, except admits that (1) on December 17, 2025, CCM submitted an unsolicited, revised, all-cash offer to buy TWO at 1.15x fully diluted adjusted tangible common book value per share, representing a 23% premium to TWO's share price as of December 15, 2025; and (2) on December 18, 2025, TWO's Board made a determination in good faith and in consultation with its legal and financial advisors that CCM's offer was not a "Company Superior Proposal" under the UWM Merger Agreement, but that it could be reasonably expected to lead to a "Company Superior Proposal" under the UWM Merger Agreement, and authorized TWO's management and advisors to enter into discussions with, and pose questions to, CCM to explore the possibility of a transaction with CCM.

22. Paragraph 22 contains UWM's characterizations to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 22, except admits that CCM withdrew its December 17, 2025 offer on December 21, 2025.

23. Paragraph 23 contains UWM's characterizations to which no response is required. To the extent a response is required, TWO lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 23, respectfully refers this Court to UWM's Registration Statement on Form S-4, dated January 30, 2026 (the "UWM Registration Statement") filed with the SEC for a complete and accurate description of its contents, and otherwise denies the allegations in Paragraph 23.

24. Paragraph 24 contains UWM's characterizations to which no response is required. To the extent a response is required, TWO lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 24, respectfully refers this Court to UWM's Registration Statement for a complete and accurate description of its contents, and otherwise denies the allegations in Paragraph 24, except admits that MSRs can be impacted by changes in interest rates, which can fluctuate over time.

25. Paragraph 25 contains UWM's characterizations to which no response is required. To the extent a response is required, TWO (1) lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 25 regarding when the "UWM Merger was expected to close," (2) respectfully refers this Court to the UWM Merger Agreement for a complete and accurate description of its terms, and (3) otherwise denies the allegations in Paragraph 25.

26. Paragraph 26 contains legal conclusions to which no response is required. To the extent a response is required, TWO respectfully refers this Court to the UWM Merger Agreement for a complete and accurate description of its terms, and otherwise denies the allegations in Paragraph 26.

27. Paragraph 27 contains legal conclusions to which no response is required. To the extent a response is required, TWO respectfully refers this Court to the UWM Merger Agreement

for a complete and accurate description of its terms, and otherwise denies the allegations in Paragraph 27.

28. Paragraph 28 contains legal conclusions to which no response is required. To the extent a response is required, TWO respectfully refers this Court to the UWM Merger Agreement for a complete and accurate description of its terms, and otherwise denies the allegations in Paragraph 28.

29. Paragraph 29 contains legal conclusions to which no response is required. To the extent a response is required, TWO respectfully refers this Court to the UWM Merger Agreement for a complete and accurate description of its terms, and otherwise denies the allegations in Paragraph 29.

30. Paragraph 30 contains legal conclusions to which no response is required. To the extent a response is required, TWO respectfully refers this Court to the UWM Merger Agreement for a complete and accurate description of its terms, and otherwise denies the allegations in Paragraph 30.

31. Denied.

32. Denied.

33. Denied.

34. Admitted.

35. Denied.

36. Paragraph 36 contains UWM's characterizations to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 36, except admits that (1) TWO's stockholder base consists of both institutional investors and retail investors, and (2) TWO retained D.F. King as its proxy solicitor.

37. Paragraph 37 contains legal conclusions to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 37.

38. Paragraph 38 contains legal conclusions to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 38, and respectfully refers this Court to Rebecca Sandberg's March 7, 2026 email for a complete and accurate description of its contents.

39. Denied.

40. Paragraph 40 contains UWM's characterizations to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 40, except admits that TWO provided to UWM the Non-Objecting Beneficial Owners ("NOBO") list before TWO's March 16, 2026 stockholder meeting.

41. TWO denies the allegations in Paragraph 41, except admits that UWM retained Okapi.

42. Paragraph 42 contains UWM's characterizations to which no response is required. To the extent a response is required, TWO respectfully refers this Court to Rebecca Sandberg's March 7, 2026 email for a complete and accurate description of its contents, and otherwise denies the allegations in Paragraph 42.

43. Paragraph 43 contains UWM's characterizations to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 43, except admits that (1) as of March 16, 2026, a majority of TWO stockholders had not voted for the UWM Merger; (2) UWM requested an adjournment of TWO's March 16, 2026 stockholder meeting; and (3) on March 16, 2026, TWO issued a press release announcing the adjournment of its March 16, 2026 stockholder meeting to March 24, 2026.

44. Paragraph 44 contains UWM's characterizations and/or legal conclusions to which no response is required. To the extent a response is required, TWO lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 44 regarding Okapi's solicitation efforts and denies the remaining allegations in Paragraph 44, except admits that, as of March 26, 2026, a majority of TWO stockholders had not voted for the UWM Merger.

45. Paragraph 45 contains UWM's characterizations and/or legal conclusions to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 45 and respectfully refers this Court to the UWM Merger Agreement for a complete and accurate description of its terms.

46. Paragraph 46 contains UWM's characterizations to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 46, except admits that UWM requested information and the NOBO list before TWO's March 16, 2026, stockholder meeting.

47. Denied.

48. Paragraph 48 contains UWM's characterizations and/or legal conclusions to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 48 and respectfully refers this Court to Rebecca Sandberg's March 7, 2026 email for a complete and accurate description of its contents.

49. Paragraph 49 contains legal conclusions to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 49 and respectfully refers this Court to the UWM Merger Agreement for a complete and accurate description of its terms.

50. TWO respectfully refers this Court to CCM's March 17, 2026 proposal for a complete and accurate description of its contents, and otherwise denies the allegations in Paragraph 50.

51. Admitted.

52. Paragraph 52 contains UWM's characterizations to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 52.

53. TWO respectfully refers this Court to the UWM Merger Agreement for a complete and accurate description of its terms, and otherwise denies the allegations in Paragraph 53.

54. Paragraph 54 contains UWM's characterizations to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 54, except admits that, on March 21, 2026, TWO informed UWM by email that it had determined that CCM's March 17, 2026, proposal constituted a Company Superior Proposal under the UWM Merger Agreement.

55. Paragraph 55 contains UWM's characterizations to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 55, except admits that, on March 20, 2026, UWM submitted a revised proposal. TWO respectfully refers this Court to UWM's March 20, 2026 proposal for a complete and accurate description of its contents, and otherwise denies the allegations in Paragraph 55.

56. Paragraph 56 contains UWM's characterizations to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 56, except admits that, on March 23, 2026, TWO adjourned its March 24, 2026 stockholder meeting to April 7, 2026.

57. Paragraph 57 contains UWM's characterizations to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 57, except admits

that, on March 24, 2026, CCM submitted a revised all-cash bid to acquire TWO for $10.80 per share, and respectfully refers this Court to CCM's March 24, 2026 proposal for a complete and accurate description of its contents.

58. Paragraph 58 contains UWM's characterizations to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 58, except admits that, on March 24, 2026, UWM submitted a revised proposal to TWO. TWO respectfully refers this Court to UWM's March 24, 2026 proposal for a complete and accurate description of its contents, and otherwise denies the allegations in Paragraph 58.

59. Paragraph 59 contains UWM's characterizations and/or legal conclusions to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 59, except admits that, on March 24, 2026, UWM sent a letter to TWO. TWO respectfully refers this Court to UWM's March 24, 2026 letter for a complete and accurate description of its contents, and otherwise denies the allegations in Paragraph 59.

60. Denied.

61. Denied.

62. Paragraph 62 contains UWM's characterizations to which no response is required. To the extent a response is required, TWO lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 62 regarding how UWM would have acted and denies the remaining allegations in Paragraph 62, except admits that, on March 25, 2026, TWO sent a letter to UWM. TWO respectfully refers this Court to TWO's March 25, 2026 letter for a complete and accurate description of its contents, and otherwise denies the allegations in Paragraph 62.

63. Paragraph 63 contains UWM's characterizations to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 63, except admits that, on March 27, 2026, TWO notified UWM that it was terminating the Merger Agreement pursuant to Section 8.1(d), had accepted CCM's proposal, had executed a merger agreement with CCM (the "CCM Merger Agreement"), and was canceling the April 7, 2026 stockholder meeting.

64. Denied.

65. Paragraph 65 contains UWM's characterizations to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 65, except admits that, on April 10, 2026, TWO filed a preliminary proxy statement with the SEC. TWO respectfully refers this Court to TWO's April 10, 2026 preliminary proxy statement for a complete and accurate description of the events and process at issue, and otherwise denies the allegations in Paragraph 65.

66. TWO admits that, on April 20, 2026, it filed a definitive proxy statement with the SEC in connection with the proposed CCM Merger. TWO respectfully refers this Court to TWO's definitive proxy statement filed with the SEC on April 20, 2026 for a complete and accurate description of the events and process at issue, and otherwise denies the allegations in Paragraph 66.

67. Paragraph 67 contains UWM's characterizations to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 67, except admits that (1) on April 20, 2026, UWM submitted a proposal to TWO; (2) on April 23, 2026, TWO requested additional information from UWM regarding its April 20 proposal; and (3) on April 24, 2026, UWM delivered to TWO a letter from Mizuho Bank, Ltd. ("Mizuho"). TWO respectfully refers this Court to UWM's April 20, 2026 proposal and the Mizuho letter for a complete and accurate description of their contents, and otherwise denies the allegations in Paragraph 67.

68. Paragraph 68 contains UWM's characterizations to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 68, except admits that, on April 27, 2026, CCM submitted a revised proposal. TWO respectfully refers this Court to CCM's April 27, 2026 proposal for a complete and accurate description of its contents, and otherwise denies the allegations in Paragraph 68.

69. Paragraph 69 contains UWM's characterizations to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 69, except admits that on April 30, 2026, UWM submitted a revised proposal and, on April 30, 2026, UWM issued an "open letter" to TWO's stockholders. TWO respectfully refers this Court to UWM's April 30, 2026 proposal and UWM's April 30, 2026 "open letter" for a complete and accurate description of their contents, and otherwise denies the allegations in Paragraph 69.

70. Paragraph 70 contains UWM's characterizations and/or legal conclusions to which no response is required. To the extent a response is required, TWO denies all allegations in Paragraph 70, except admits that, on May 3, 2026, TWO's Board determined, in consultation with its legal and financial advisors, that UWM's April 30, 2026 proposal was not, and could not reasonably be expected to lead to, a Company Superior Proposal under the terms of the CCM Merger Agreement.

71. Paragraph 71 contains UWM's characterizations to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 71, except admits that, on May 6, 2026, CCM submitted a revised proposal. TWO respectfully refers this Court to CCM's May 6, 2026 proposal for a complete and accurate description of its contents, and otherwise denies the allegations in Paragraph 71.

72. Paragraph 72 contains UWM's characterizations to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 72, except admits that, on May 11, 2026, UWM submitted a proposal to TWO and issued an "open letter" to TWO's stockholders. TWO respectfully refers this Court to UWM's May 11, 2026 proposal and UWM's May 11, 2026 "open letter" for a complete and accurate description of their contents, and otherwise denies the allegations in Paragraph 72.

73. Paragraph 73 contains UWM's characterizations to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 73, except admits that (1) after May 11, 2026, UWM, TWO, and CCM issued public statements; and (2) on May 11, 2026 and May 13, 2026, respectively, Institutional Shareholder Services ("ISS") and Glass Lewis recommended that TWO stockholders vote against the CCM Merger. TWO respectfully refers this Court to UWM, TWO, and CCM's public statements, the ISS recommendation, and the Glass Lewis recommendation for a complete and accurate description of their contents, and otherwise denies the allegations in Paragraph 73.

74. Paragraph 74 contains UWM's characterizations to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 74 and respectfully refers this Court to the ISS recommendation for a complete and accurate description of its contents.

75. Paragraph 75 contains UWM's characterizations to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 75 and respectfully refers this Court to the Glass Lewis recommendation for a complete and accurate description of its contents.

76. Paragraph 76 contains UWM's characterizations to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 76 and respectfully

refers this Court to the Egan-Jones Proxy Services ("Egan-Jones") recommendation for a complete and accurate description of its contents.

77. Paragraph 77 contains UWM's characterizations to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 77, except admits that (1) TWO adjourned its stockholder meeting from May 19 to May 28 to June 11 to June 23 to July 2, 2026; and (2) TWO's stockholders approved the CCM Merger at the July 2, 2026 stockholder meeting.

78. Denied.

79. Paragraph 79 contains UWM's characterizations to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 79 and respectfully refers this Court to UWM's May 11, 2026 proposal for a complete and accurate description of its contents.

80. Paragraph 80 contains UWM's characterizations to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 80, and respectfully refers this Court to CCM's March 17, 2026 proposal and subsequent proposals for complete and accurate descriptions of their contents.

81. Paragraph 81 contains UWM's characterizations to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 81, and respectfully refers this Court to the ISS, Glass Lewis, and Egan-Jones recommendations for complete and accurate descriptions of their contents.

82. Paragraph 82 contains UWM's characterizations to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 82 and respectfully refers this Court to the ISS recommendation for a complete and accurate description of its contents.

83. Paragraph 83 contains UWM's characterizations to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 83 and respectfully refers this Court to the ISS recommendation for a complete and accurate description of its contents.

84. Paragraph 84 contains UWM's characterizations to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 84 and respectfully refers this Court to the Glass Lewis recommendation and Egan-Jones recommendation for complete and accurate descriptions of their contents.

85. TWO restates and incorporates its responses to Paragraphs 1 through 84 as if set forth fully herein.

86. Paragraph 86 contains UWM's legal conclusions to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 86 and respectfully refers this Court to the UWM Merger Agreement for a complete and accurate description of its terms.

87. Paragraph 87 contains legal conclusions to which no response is required. To the extent a response is required, TWO admits that it (1) executed the UWM Merger Agreement on December 17, 2025, and (2) terminated the UWM Merger Agreement on March 27, 2026.

88. Paragraph 88 contains legal conclusions to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 88.

89. Paragraph 89 contains legal conclusions to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 89.

90. Paragraph 90 contains legal conclusions to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 90.

91. Paragraph 91 contains legal conclusions to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 91.

92. Paragraph 92 contains legal conclusions to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 92.

93. Paragraph 93 contains legal conclusions to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 93.

94. Paragraph 94 contains legal conclusions to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 94.

95. Paragraph 95 contains legal conclusions to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 95.

96. Paragraph 96 contains legal conclusions to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 96.

97. Paragraph 97 contains UWM's characterizations and/or legal conclusions to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 97.

98. TWO restates and incorporates its responses to Paragraphs 1 through 97 as if set forth fully herein.

99. Paragraph 99 contains legal conclusions to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 99, and respectfully refers this Court to the UWM Merger Agreement for a complete and accurate description of its terms.

100. Paragraph 100 contains UWM's characterizations and/or legal conclusions to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 100, except admits that, on March 7 and March 25, 2026, TWO communicated with

UWM. TWO respectfully refers this Court to Rebecca Sandberg's March 7, 2026 email and TWO's March 25, 2026 letter for complete and accurate descriptions of their contents, and otherwise denies the allegations in Paragraph 100.

101. Paragraph 101 contains UWM's characterizations and/or legal conclusions to which no response is required. To the extent a response is required, TWO lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 101 regarding how UWM would have acted and denies the remaining allegations in Paragraph 101.

102. Paragraph 102 contains UWM's characterizations and/or legal conclusions to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 102.

103. Paragraph 103 contains UWM's characterizations and/or legal conclusions to which no response is required. To the extent a response is required, TWO lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 103 regarding how UWM would have acted and denies the remaining allegations in Paragraph 103.

104. Paragraph 104 contains UWM's characterizations and/or legal conclusions to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 104.

105. Paragraph 105 contains UWM's characterizations and/or legal conclusions to which no response is required. To the extent a response is required, TWO lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 105 regarding how UWM would have acted and denies the remaining allegations in Paragraph 105.

106. The allegations in Paragraph 106 contain UWM's characterizations and/or legal conclusions to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 106.

107. The allegations in Paragraph 107 contain UWM's characterizations and/or legal conclusions to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 107.

108. The allegations in Paragraph 108 contain UWM's characterizations and/or legal conclusions to which no response is required. To the extent a response is required, TWO lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 108 regarding UWM's reliance, denies the remaining allegations in Paragraph 108, and respectfully refers this Court to the UWM Merger Agreement for a complete and accurate description of its terms.

109. The allegations in Paragraph 109 contain UWM's characterizations and/or legal conclusions to which no response is required. To the extent a response is required, TWO lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 109 regarding what UWM would have done, and denies the remaining allegations in Paragraph 109. TWO respectfully refers this Court to the UWM Merger Agreement for a complete and accurate description of its terms, and otherwise denies the allegations in Paragraph 109.

110. The allegations in Paragraph 110 contain UWM's characterizations and/or legal conclusions to which no response is required. To the extent a response is required, TWO denies the allegations in Paragraph 110.

**DEFENSES**

TWO asserts the following defenses with respect to every cause of action asserted by UWM, without in any way assuming the burden of production, persuasion, or proof with respect

to any matter that applicable law places on UWM. TWO reserves the right to raise any additional defenses, counterclaims, cross-claims, and third-party claims not asserted herein of which TWO may become aware through discovery or otherwise.

**FIRST DEFENSE**

The Complaint fails to state a cause of action upon which relief can be granted.

**SECOND DEFENSE**

UWM's contract claims are barred, in whole or in part, by Sections 8.1(d), 8.2(b), and 8.3(a)(ii) of the UWM Merger Agreement, because UWM received and accepted the Termination Fee.

**THIRD DEFENSE**

UWM's contract claims are barred, in whole or in part, because any alleged breach was not "willful" under Section 8.2(b) of the UWM Merger Agreement.

**FOURTH DEFENSE**

UWM's contract claims are barred, in whole or in part, because TWO acted in good faith.

**FIFTH DEFENSE**

UWM's contract claims are barred, in whole or in part, because TWO performed or substantially performed its material obligations under the UWM Merger Agreement, and any alleged nonperformance was immaterial, excused by the circumstances, or caused by factors outside TWO's control.

**SIXTH DEFENSE**

UWM's contract claims are barred, in whole or in part, because UWM's alleged losses were not actually or proximately caused by any alleged breach.

**SEVENTH DEFENSE**

UWM's contract claims are barred, in whole or in part, by waiver because UWM accepted the Termination Fee under the UWM Merger Agreement despite having knowledge of the challenged conduct.

**EIGHTH DEFENSE**

UWM's contract claims are barred, in whole or in part, by equitable estoppel and acquiescence because UWM accepted the Termination Fee under the UWM Merger Agreement and TWO reasonably relied on Plaintiffs' acceptance of the Termination Fee.

**NINTH DEFENSE**

UWM's fraud claims are barred, in whole or in part, because UWM failed to plead them with particularity as required by Federal Rule of Civil Procedure 9(b).

**TENTH DEFENSE**

UWM's fraud claims are barred, in whole or in part, because TWO did not make any false or misleading statements of material fact or omit any material fact.

**ELEVENTH DEFENSE**

UWM's fraud claims are barred, in whole or in part, because TWO's challenged statements were accurate in all material respects.

**TWELFTH DEFENSE**

UWM's fraud claims are barred, in whole or in part, because TWO's challenged statements are improperly attributed to TWO.

**THIRTEENTH DEFENSE**

UWM's fraud claims are barred, in whole or in part, because the alleged misstatements or omissions are nonactionable expressions of opinion that UWM cannot prove were not truly held at the time they were made.

## FOURTEENTH DEFENSE

UWM's fraud claims are barred, in whole or in part, because the alleged misstatements or omissions are immaterial and/or mere puffery.

## FIFTEENTH DEFENSE

UWM's fraud claims are barred, in whole or in part, because TWO acted in good faith at all times during the relevant period, did not participate in any alleged wrongful conduct challenged by UWM, and did not act with scienter.

## SIXTEENTH DEFENSE

UWM's fraud claims are barred, in whole or in part, because at all relevant times, TWO relied in good faith on the representations, reports, expert opinions, and/or advice of others.

## SEVENTEENTH DEFENSE

UWM's fraud claims are barred, in whole or in part, because UWM did not justifiably or reasonably rely on any alleged misstatements or omissions of material fact by TWO.

## EIGHTEENTH DEFENSE

UWM's fraud claims are barred, in whole or in part, because UWM did not actually rely on any alleged misstatements or omissions of material fact by TWO.

## NINETEENTH DEFENSE

UWM's claims are barred, in whole or in part, because all losses and damages alleged in the Complaint are the result of independent, superseding, and/or intervening causes and are not the result of any act or omission of TWO.

## TWENTIETH DEFENSE

UWM's claims are barred, in whole or in part, because UWM's losses were not actually or proximately caused by TWO.

**TWENTY-FIRST DEFENSE**

Any damages or injuries suffered by UWM are the proximate result, either in whole or in part, of actions or omissions of persons or entities other than TWO.

**TWENTY-SECOND DEFENSE**

UWM's claimed damages are barred, in whole or in part, because they are remote, speculative, and/or conjectural and are therefore unrecoverable.

**TWENTY-THIRD DEFENSE**

UWM did not suffer any losses and thus cannot recover any damages.

**TWENTY-FOURTH DEFENSE**

UWM's claims are barred, in whole or in part, because UWM failed to mitigate its claimed damages.

**TWENTY-FIFTH DEFENSE**

UWM's purported claims against TWO and the allegations upon which they are based are improperly vague, ambiguous, and confusing. TWO reserves the right to request a more definite statement.

**TWENTY-SIXTH DEFENSE**

UWM's claims are barred, in whole or in part, because UWM acted with unclean hands.

**TWENTY-SEVENTH DEFENSE**

TWO has insufficient knowledge or information upon which to form a belief as to whether there may be additional affirmative defenses available to it, and therefore reserves the right to assert such additional defenses in the event that discovery indicates they would be appropriate.

**DEMAND FOR JURY TRIAL**

TWO demands a trial by jury on all issues so triable.

Dated: October 1, 2026

By: /s/ WAMcDaniel, Jr.

William Alden McDaniel, Jr.
Bar No. 00571
Jacquelyn A. Kapinos
Bar No. 30474
BALLARD SPAHR LLP
111 S. Calvert St. 27th Floor
Baltimore, MD 21202
Telephone: (410) 528-5502
mcdanielw@ballardspahr.com
kapinosj@ballardspahr.com

Tariq Mundiya (admitted *pro hac vice*)
Jeffrey B. Korn (admitted *pro hac vice*)
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
Phone: (212) 728-8000
tmundiya@willkie.com
jkorn@willkie.com

Joshua S. Levy (admitted *pro hac vice*)
WILLKIE FARR & GALLAGHER LLP
1875 K Street, N.W.
Washington, D.C. 20006
Phone: (202) 303-1000
jlevy@willkie.com

*Counsel for Defendant and Counterclaimant Two Harbors Investment Corp.*